Ràymond v. Fish.

―――――

GIDEON F. RAYMOND vs. NATHAN S. FISH AND OTHERS.

The statute with regard to public health (Gen. Statutes, p. 258, secs. 1 and 2), provides that the board of health in every town shall have " all the power necessary and proper for preserving the public health and preventing the spread of malignant diseases," and that it shall be their duty " to examine into all nuisances and sources of filth injurious to the public health and cause to be removed all filth found within the town which in their judgment shall endanger the health of the inhabitants." Held that the members of the board of health, where acting in

good faith and with reasonable caution, were not liable for an error of judgment in causing the removal as a nuisance of property which they believed to be the cause of the prevalence of a malignant disease.

And held that they had the right to remove such property as a nuisance injurious to the public health, though not of the character of filth.

Also held to make no difference that the board, at the time of the actual removal, was composed of different members from those which composed it when the order was issued for its removal.

And held that the action of the board was not illegal because the removal, which was ordered in August, was not made until December when the disease had ceased to be prevalent ; its earlier removal being attended with danger of an increase of its noxious influence, and the removal when made being regarded as necessary to prevent a recurrence of the disease in the following summer.

The act giving the board of health such power is not unconstitutional.

[Argued May 30th—decided September 7th, 1883.]

ACTION to recover damages for the removal of brush with oysters growing upon it, from Pequonock River, in the town of Groton ; brought to the Superior Court in New London County. The defendants justified the acts complained of as done under an order of the board of health of the town, alleging that the brush was, and had been condemned as, a nuisance, and that they did nothing that it was not necessary to do to remove the nuisance. The case was tried to the court, and the following facts found :

It was proved that the plaintiff, at the time of the acts complained of, was the lawful proprietor and in possession of sundry oyster beds, described in his complaint, and that they had been lawfully designated as suitable places for the purpose of cultivating oysters. The Pequonock river has long been favorably known for its native oysters, which, on account of their superior quality, commanded the highest price in the market. Until within a few years the supply has been limited to the small quantities gathered from the rocks and other objects near the margin of the river. The main bed of the river, to within a few feet of the shore, being composed of a thick muddy deposit, was unfavorable to the growth of oysters. Stimulated by the protection of the statute laws of the state encouraging the artificial culture of oysters, various applications were made within the

Raymond v. Fish.

past five or six years, and plats or designations legally assigned to such applicants, on both sides of the channel, leaving a width of channel of about one hundred feet, to within forty feet of the shore. Upon these plats attempts were made, with varying success, to cultivate oysters by placing upon the muddy bottom, brush and limbs of trees to catch the spawn or spat of the oyster, which was known in the breeding season to be floating in the water in large quantities. By this method many hundreds of bushels of oysters were raised and cultivated, commanding a ready sale in the home market and in New York, at the average price of two dollars per bushel. As many as twenty-five bushels of oysters were known to have been gathered from a single brush or limb; but this was not common.

In the years 1879–80–81, the plaintiff placed upon his plats, in all, about six thousand seven hundred white birch brush or poles, from fifteen to twenty feet in length and from three to four inches in diameter at the butts. Greater care was taken by him in 1880 and 1881 than before, in placing the brush or poles, the butts being forced from two to three feet into the mud, leaving them at an angle of about forty-five degrees with the current. This river is an arm of the sea, about three miles in length, through which the tide ebbs and flows with a mean rise and fall of about three feet.

At the time of the acts complained of oysters in all stages of growth and development had gathered, and were growing upon the brush in each of the plats. Upon the brush planted in 1879 there was a large number of bushels of oysters fit for use and for market, and a large quantity nearly fit for use and for market. On the brush last planted there was a large quantity of oysters set, which had grown in a few weeks from a small speck or spat, to the size of a quarter of a dollar. It requires about two years for the oyster to fully develop.

In May, 1881, the scarlet fever and diphtheria broke out in the village of Pequonock, and soon assumed a malignant type and became epidemic, and from that time to September

1st, 1881, there were in all about forty cases, and from five to eight of them proved fatal. The attention of the board of health of the town of Groton was called to the subject; meetings were held, examinations were made by its members and committees of the board, of the river, of the brush and oysters, and of an offensive pig-stye; also of some heaps of river mud and sea weed which had been collected and deposited upon or near the shore of the river; also of some swamps or marshes, all which were near to the locality infected. The board of health, not being able to come to any satisfactory result as to the cause of the epidemic, decided to ask the advice of the state board of health, and did so. Thereupon Dr. Charles N. Chamberlain of Hartford, secretary of the state board of health, visited Pequonock, and made a personal examination, lasting some two-and-a-half hours. Upon his return to Hartford he wrote a letter to the local board of health, to the effect that the brush in the river, and the oysters, including the plaintiff's, were a nuisance. It was not proved that the state board of health acted on the subject, and no record or memoranda of its doings touching the matter (if there were any) were introduced or offered in evidence on the trial.

The defendants admitted that they entered on the plaintiff's oyster plats on the 27th of December, 1881, and forcibly removed all the brush, with the oysters attached, which were then upon the plats, and piled them on the shore and destroyed them. They claimed that they were justified in so doing by the order of the local board of health, and in proof thereof introduced the record of the action of the board, which was received, subject to the plaintiff's objection.

The following facts appeared from this record. An application was made by a number of the inhabitants of the village to the board, stating that they believed the brush in question to be the cause of the epidemic and that the public health required its removal. This application was dated June 28th, 1881. The board upon receiving it took the

advice of a physician and appointed an early day for visiting and examining the place where the nuisance was claimed to exist. After this examination they decided to have a public hearing on the matter, and fixed July 16th as the day for it and gave public notice, by posting on the sign post, to all persons interested to attend. On July 16th the board met, and after hearing all persons who desired to be heard, voted to take the advice of the state board of health. On the 6th of August the board again met, and accepted a report of the secretary of the state board of health who had made a personal examination of the locality, and directed their clerk to notify all parties owning the brush of this report. They also at this meeting voted to ask the advice of legal counsel. On the 10th of August the board met again, when a committee appointed to obtain legal advice reported that the advice was to remove the brush. They then resolved to "concur with the state board in their recommendation that the brush be removed as a nuisance," and directed the president and secretary to notify all parties owning the brush to commence the removal of it on the 15th of August and to pursue the work until it was all removed. The president and secretary on the same day sent written notice of the order to sundry persons interested in the brush and among them to the plaintiff. On the 24th of August the board met again and voted not to require the removal of the brush till November, and appointed a committee to carry out the order as thus modified. On December 1st, 1881, the term of office of the board of health for the preceding year having expired, the board for the ensuing year was organized. The new board was made up in part of members who had not been on the board during the year preceding. At this meeting an order was made "to carry into effect the order made by the former board of health" for the removal of the brush, and a committee was appointed to cause it to be done. On the 8th of December the board met again and voted—(1.) That the brush was a nuisance and injurious to the public health. (2.) That all former votes requiring its immediate removal

Raymond *v.* Fish.

be reconsidered, and the votes of the last meeting to that effect be rescinded. (3.) That the owners of the brush (naming them, and among them the plaintiff,) should be required to remove the brush and bury or burn it on or before December 25th. (4th.) That the clerk of the board give notice of the order to the owners on or before December 12th. On the 22d of December the board met again and appointed a committee to remove the brush immediately after the 25th of December. The committee removed the brush accordingly.

Both boards of health acted in good faith, and the defendants acted in good faith in removing and destroying the brush and oysters, and did no more than was necessary to carry out the orders and directions of the local board of health as set forth in the records.

The scarlet fever and diphtheria ceased to be epidemic from and after September 1st, 1881, and no new cases occurred after that time, although there were some sporadic cases of typho-malarial fever till late in the fall of that year, which was unusual in that locality.

Neither the brush, nor oysters, nor both combined, were the origin or producing cause of the disease, but whether they may not have furnished conditions favorable to its spread and continuance, and made it more malignant than it otherwise would have been, (as the defendants claimed, and for that reason claimed it to be a nuisance), the court is not able, from the conflicting testimony, to determine. But it did not in any way injuriously affect the public health at any time after September 1st, 1881, and it was not in fact a nuisance after that time.

The plaintiff was before the board of health, August 10th, 1881, and fully heard before the passage of the vote of that date. He was not before the board on the 8th of December, 1881, and had no notice to be present, nor of its meeting, and had no knowledge of it till afterwards. He was however duly notified of its action of that date.

Thomas W. Noyes and Nathan S. Fish, two of the defendants, are the persons appointed by the board a commit-

tee to remove the brush, at its meeting of December 22d, and the other defendants acted at the request of Noyes and Fish in the removal and destruction of the brush and oysters.

No investigation was made by the new board of health, as such, by committee or otherwise, after it was organized, December 1st, 1881, to determine whether the brush was a nuisance, as being injurious to the public health. It acted on what had been determined by the old board touching the matter.

The actual damage which the plaintiff sustained by the removal and destruction of the brush and oysters is five thousand dollars.

Upon these facts the case was reserved for the advice of this court.

*D. Chadwick* and *A. Brandegee*, for the plaintiff.

1. A board of health is a local organization of inferior and limited jurisdiction. Its powers are prescribed and strictly limited by statute, subject to constitutional limitation. These powers are solely ministerial and not judicial. It cannot determine for itself conclusively and beyond the power of review, the existence of that state of facts which alone invokes its jurisdiction and justifies its action. Its members are liable as individuals, if they destroy property which in point of fact is not a nuisance, and which is so determined subsequently by competent judicial authority. In *Brown* v. *O'Connell*, 36 Conn., 446, Judge BUTLER, giving the opinion of the court, says :—"No judicial power is vested in the General Assembly either directly or as an incident to legislative power, and the General Assembly cannot confer it." A consideration of the constitution, nature and duties of a board of health—the numbers and material of which it is composed—their inexperience—the absence of any record, issue, pleadings, rules of procedure or of evidence—the want of power to enforce orders, compel the presence of witnesses or administer oaths—the disqualification of its members from relationship, prejudice or interest—the liability to be

Raymond *v.* Fish.

carried away by prejudice, clamor or panic—all lead irresistibly to the conclusion that its powers are in no sense judicial. In *Averill* v. *Hull*, 37 Conn., 323, the defense was that certain oyster beds had been designated by the proper committee, " who acted officially ; that proceedings had been had in conformity to the statute, and that acting only as public officers they ought to be justified." Judge SEYMOUR, in giving the opinion of the court, says :—" The committee indeed acted officially, but only as ministerial officers," otherwise " the native oyster beds of the state would be subjected to the control of a committee of the town, without a hearing and without appeal." And in the same case the right to confiscate vessels engaged in violation of oyster laws, although expressly given in the statute, was held unconstitutional, as not providing for " either appeal or right of trial by jury." The statute itself makes a noticeable distinction between " nuisances " and " filth." It treats the latter only as outlawed, as having neither ownership nor rights. It gives plenary and summary power to the board to remove all " filth which in their judgment shall endanger heafth." But it is remarkable that this power of determining " in their own judgment," is expressly withholden with reference to " nuisances," although " nuisances and filth " are coupled together in all other provisions of the statute. Filth, offal, and other putrid animal and vegetable matter, which plainly attest their presence and noxious qualities to the nose and eye, are included in the category of " nuisances *per se.*" There is no valuable property in such filth and it may be abated wherever found. But property and useful trades lawful in themselves, which may become injurious or offensive only by neglect or the presence or absence of certain extrinsic conditions, cannot thus be summarily abated. They can only be adjudged nuisances after inquiry and evidence by competent legal tribunals. Whoever undertakes to destroy them summarily without such adjudicaction, does so at the peril of damages in case such property should be finally adjudged to be no nuisance.

2. We shall find these principles fully sustained by the

authorities. The current of respectable authority is in one direction as to the power of a sanitary board to abate " property " summarily. " Where a tribunal does not proceed according to the course of the common law, but exercises a restricted and special jurisdiction under the provisions of some statute law, it cannot find the facts essential to the exercise of its jurisdiction." *Sears* v. *Terry*, 26 Conn., 282. In *Underwood* v. *Green*, 42 N. York, 140, the defendant justified, by orders of the city inspector, under an ordinance directing him " to remove all dead animals and every putrid, offensive and unsound substance," the removal from the cars of a load of swine that had become suffocated in transit. EARL, C. J., says :—" He is an officer of limited and special jurisdiction, and when in any given case his power is challenged, he must prove some facts invoking or tending to invoke his discretion. He could not confiscate a stock of hides entirely upon the allegation that they were injurious to health. He must show that they were putrid, or in some way dangerous to health, before he can have a case clearly for the exercise of his discretion." In *Schuster* v. *Metropolitan Board of Health*, 49 Barb., 450, the court says :—" While the inspection and regulation of pursuits in a large city which are liable to become injurious to public health are within the police powers, lawfully delegated to and exercised by local and municipal corporations, the power to suppress such pursuits when they have been immemorially exercised is wholly beyond and above police powers and extends into the domain of legislative function." In *City of Salem* v. *Eastern R. R. Co.*, 98 Mass., 445, relied upon by the defendants as laying down the doctrine more strongly than in any known case of the summary powers of the board of health, WELLS, J., goes on to qualify the absolute powers of such boards as follows :—" It would seem to be the natural conclusion of such statutes, to apply the terms nuisance, sources of filth, causes of sickness, &c., to those obvious and palpable objects from which danger to health arises. But it may well be questioned whether property (not a nuisance *per se*) can be abated in this summary

manner as being such nuisance in itself as is contemplated by the statute. To what extent they may destroy private property—when and in what manner compensation is recoverable—whether they may be held personally responsible if they injure property—are questions which need not now be decided." These questions which the learned judge expressly excepts from his decision, are the precise questions involved in this case. In *Sawyer* v. *State Board of Health*, 125 Mass., 183, LORD, J., in giving the latest views of that court, says :—" A person injured by an order of the state board of health, prohibiting his carrying on a certain trade and adjudging it to be a nuisance, has the right of appeal to a jury. Although such right is not given him by this statute, we cannot suppose that the legislature intended to change the whole system of noxious trades by simply conferring the power to prohibit it upon a state board of health. If the construction called for by the respondent is correct, there is no where any power of restriction of the action of this board. It is absolute, final and conclusive. The whole system by which the rights of the public and the rights of citizens are secured through the intervention of trials by jury is absorbed in the jurisdiction of the state board of health." See also *Belcher* v. *Farrar*, 8 Allen, 325; *Manhattan Manuf. Co.* v. *Van Keuren*, 23 N. Jer. Eq., 251; *State* v. *Street Commissioner of Trenton*, 36 N. Jer. Law, 283; *Hutton* v. *City of Camden*, 39 id., 126; *Clark* v. *Magor &c. of Syracuse*, 13 Barb., 34; *Rogers* v. *Barker*, 31 id., 453; *Mayor &c. of New York* v. *Board of Health*, 31 How. Pr. R., 396; *Wreford* v. *The People*, 14 Mich., 46; 2 Waterman on Trespass, 77 ; Wood on Nuisances, § 740.

3. Whether a thing is a "nuisance" or not is ordinarily a question of fact dependent upon a great variety of circumstances to be determined upon evidence by competent legal authority. In *Burnham* v. *Hotchkiss*, 14 Conn., 316, the surveyor of highways, under the direction of the selectmen, took down a wall and filled up a cellar in the public highway and justified his action on the ground that it was a nuisance to travel. The Supreme Court decided that

"whether or not a nuisance was a question of fact for the jury." In *Stowe* v. *Miles*, 39 Conn., 428, there was a petition for the abatement of fish works as a nuisance under the statute. The Supreme Court dismissed the bill because the question of "nuisance or not was not found as a fact." CARPENTER, J., in giving the opinion, says:—"Whether nuisance or not is a question of fact purely, depending upon the nature, character and frequency of the offensive odors, and the extent of their continuance. There is a class of cases where the question may be a mixed one of fact and of law, and where the court may determine judicially the question of nuisance upon the facts found of record. If in this case the court is so to determine, it will find from an inspection of the record:—(1.) That the Pequonock river is an arm of the sea three miles in length, through which the tide ebbs and flows twice a day, with a mean rise and fall of three feet. (2.) That a space of one hundred feet in width was left open for a channel in the center, and forty feet on each side between the brush and the shore. (3.) That at the time of the spoliation live oysters in all stages of growth and development were collected upon the brush; a large quantity ready for market; a large quantity nearly ready, and a great many growing, from the size of a quarter of a dollar upwards. (4.) That the time was mid-winter, when neither oysters nor brush could have had any perceptible effect upon the atmosphere or health. (5.) That it is found that neither the brush nor the oysters were a nuisance or had any effect whatever prejudicial to public health, for more than two months before the action of the board of health declaring the brush a nuisance.

4. If it be claimed that the decision of the board of health was founded upon and justified by the action of their predecessors, we reply:—(1.) That the decision of the board is not a judgment. It can not be enforced as the judgment of a court of law by another tribunal. One board cannot justify by the action of another. That would. in effect be giving to the action of the other the force of a judgment. (2.) Its term of office is limited by law. It

consists of the selectmen and justices for the time being.
Each board acts on its own evidence and upon its own
responsibility. (3.) An examination of the vote of the old
board further discloses the fact that even it did not find the
property to be a nuisance. It only "concurred with the
recommendation of the state board of health." (4.) But
the record shows that the state board of health never inves-
tigated the matter, nor gave any judgment in the premises.

5. The statute under which the acts were done is uncon-
stitutional. (1.) Because it takes away the right of trial
by jury. (2.) Because it deprives the owner of his property
without due process of law. (3.) Because it confers judi-
cial powers upon a tribunal not warranted by the constitu-
tion. In *Harding* v. *Stamford Water Co.*, 41 Conn., 93, the
General Assembly had incorporated in the charter of a cor-
poration for public purposes, an exemption from liability to
pay damages. FOSTER, J., says:—"It seems almost super-
fluous to say, that under the constitution of this state pri-
vate property cannot be taken for public use without just
compensation. Indeed, under no government but the most
grinding despotism could such power be exercised. It vio-
lates the first principle of common right." In *Hooker* v.
*New Haven & Northampton Co.*, 14 Conn., 152, WILLIAMS,
C. J., says:—"It is no doubt incident to the sovereignty of
government that it may take private property for the public
use, of the necessity and expediency of which itself must
judge. But the obligation to make compensation is com-
mensurate with the right. The fundamental maxim of a
free government requires that the right of personal liberty
and private property shall be held sacred." In *Kempe's
Lessee* v. *Kennedy*, 5 Cranch, 185, MARSHALL, C. J. says:
—"It may well be doubted whether the nature of society
and of government does not prescribe some limits to the
legislative power. And if any can be prescribed, where are
they to be found, if the property of an individual fairly and
honestly acquired may be seized without compensation?"
In *Gardner* v. *Village of Newburgh*, 2 Johns. Ch., 166,
Chancellor KENT says:—"A fair compensation must in all

Raymond v. Fish.

cases be made to the individual affected. This is a necessary qualification accompanying the exercise of legislative power in taking private property for public use. It is admitted by the soundest authorities and adopted by all temperate and civilized governments from a deep and universal sense of justice." In Stevens v. Proprietors of Middlesex Canal, 12 Mass., 466, the court says :—" If the legislature should for public advantage or convenience authorize anything which would produce destruction or detriment to private property, without at the same time affording means of relief and indemnification to the owner of the property injured, he would undoubtedly have his action at common law against those who caused the injury." The doctrine of the defendants carried to its legitimate conclusion is that all the property of the state at the time of an epidemic is subject to the jurisdiction of boards of health. It can be summarily destroyed without notice, trial, evidence, appeal or compensation, irrespective of its condition or effect upon health, provided the board acts in good faith. Nay, it is not essential that " the board " should act at all, for the statute provides that such members as may be present shall constitute a quorum, and may act as a committee or otherwise. Any two members may meet and delegate this tremendous power to each other—a power greater than is possessed by either the executive, the judicial, or the legislative department of government, or by all united. Such a doctrine is subversive of all rights of property, all rules of law and all bonds of civil society. It would prove worse for any community which tolerated it, than any epidemic out of which its fancied necessity was begotten.

J. Halsey and S. Lucas, for the defendants, cited Beckwith v. Sturtevant, 42 Conn., 162; Commonwealth v. Tewksbury, 11 Met., 55; City of Salem v. Eastern Railroad Co., 98 Mass., 449, 451; Hart v. Mayor &c., of Albany, 9 Wend., 571; Van Wormer v. Mayor &c., of Albany, 15 id., 262; Russell v. Mayor &c., of New York, 2 Denio, 475, 479; Gregory v. City of New York, 40 N. York, 279; Sedgw.

on Const. & Stat. Law, 435; Cooley on Const. Limita-tions, 746.

PARK, C. J.   The question in this case turns upon the construction to be given to the first and second sections of the statute with regard to public health and safety, (Gen. Statutes, p. 258,) which provide as follows:—" The justices of the peace and selectmen in each town shall constitute a board of health, and have all the power. necessary and proper for preserving the public health and preventing the spread of malignant diseases therein, and may appoint its president and such health officers or health committee as it may deem expedient, and delegate to them any of its powers; and the members present at any meeting convened as the board shall direct, shall be a quorum for business. * * Such board, or such health officers or health committee, shall examine into all nuisances and sources of filth injurious to the public health, and cause to be removed all filth found within the town which in their judgment shall endanger the health of the inhabitants; and all expenses for such removal shall be paid by the person who placed it there, if known, and, if not known, by the town; and when any such filth or nuisance shall be found on private property, such board shall notify the owner or occupant of such property to remove the same at his expense, within such time as the board shall direct, and if he shall neglect to remove it he shall be fined not less than twenty dollars nor exceeding one hundred dollars and pay such expense and costs as the town shall incur by such removal; and after the expiration. of such time such board shall cause such filth or nuisance forthwith to be removed or abated; and such board, or such health officer or committee as it shall direct, may enter all places where such board shall have just cause to suspect any such nuisance or causes of filth to exist."

In the month of May, 1881, the small village of Pequonock in the town of Groton was sorely afflicted with the contagious diseases of scarlet fever and diphtheria of a

malignant character. It is said that one or more members of every household, and in some instances entire families in the village, were prostrated by one or the other or both of these diseases. From May till September of that year the sickness raged in the little community, and many deaths, numerous in proportion to the number of inhabitants, occurred. As might well have been expected, great alarm and much excitement prevailed in the village and surrounding country, and strenuous efforts were made to discover the cause of the malady. It is a matter of common knowledge that these diseases are supposed to originate in noxious exhalations from decaying animal and vegetable matter, and when once in existence are greatly aggravated by the continuance of the malarious' atmosphere. The attention of the board of health of the town of Groton was called to the subject, meetings were held by the board, and examinations were made of Pequonock river, and various other places in the vicinity of the village, to discover the cause of the malady.

Pequonock river is an arm of the sea and runs from the village and empties into Long Island Sound. It is about three miles long, and through its entire length the tide rises and falls about three feet. It is a sluggish stream, and has a thick muddy deposit at the bottom. This river had long been favorably known for the superior quality of its native oysters. They were found only near the shore, as the muddy bottom in the bed of the stream rendered it impossible for them to grow there.

The superior quality of the oysters induced the plaintiff and others to so place brush in the bed of the river that oysters might grow thereon, and thus be kept from the mud at the bottom. This was done in the years 1879 and 1880, and in the early part of 1881, and Pequonock river was filled with the brush, except a space one hundred feet wide in the middle of the river; and at the time sickness prevailed in the village oysters in all stages of growth were attached to the brush.

The board of health were unable, from their examinations

Raymond *v.* Fish.

of the river and other places, to determine with certainty what caused the malady, and thereupon requested the assistance of the state board of health. Their secretary made an examination of the river, and afterwards reported to the town board that the brush in the river with the oysters thereon were a nuisance. The town board afterwards, on the tenth day of August, 1881, had another hearing regarding the matter, at which the plaintiff and others appeared, and were fully heard. At this meeting the board passed the following vote:—" That we concur with the state board in their recommendation that the brush be removed as a nuisance." Thereupon the board, by their secretary, gave the plaintiff and others written notice to remove the brush owned by them respectively from the river, specifying a time when they were to begin to do it. The brush was not removed, and on the 8th day of December following the board, with some new members who had been elected in October preceding, again declared by a vote that the brush in the river was a nuisance and injurious to the public health; and again ordered the plaintiff and others to remove the brush owned by them respectively before a specified day; and caused due notice to be given to the owners of the action of the board. The plaintiff was not present at this meeting of the board. He had no notice that it was to be held, and had no knowledge of it till afterwards. The brush was not removed by the plaintiff, and the board, by the hands of the defendants, removed and destroyed it, with the oysters thereon, doing no unnecessary damage. The case finds that the board acted in good faith throughout the whole transaction.

The case further finds that " neither the brush, nor oysters, nor both combined, were the origin or producing cause of the diseases;" but leaves it undetermined " whether they may not have furnished conditions favorable to the spread and continuance of the diseases, and to making them more malignant than they otherwise would have been."

The malady ceased to be epidemic about the first of Sep-

tember; and after that time, it is expressly found, that the brush and oysters were not a nuisance.

These are the principal facts of the case, and they make the liability of the defendants depend upon the construction to be given to the statute already cited. The question is, does the statute confer upon the board of health the right to determine conclusively in any case what are nuisances and sources of filth which endanger the health of the inhabitants; so that if they act in good faith, and merely err in judgment, the statute will justify the act done, although the property of a third party may be destroyed? If the statute is to be so construed, then the defendants are not responsible for the damage, whatever it may be, that they may have caused the plaintiff. If it is not to be so construed—if boards of health must act at their peril in cases of emergency, then the defendants are liable, and must respond in damages for all the injury caused by their acts.

Before coming to this question directly, we should take into consideration the object of this statute, which professes to be enacted for the preservation of the " public health and safety." It is well known that diseases of the most contagious and malignant character are supposed to be caused by poisonous exhalations from decaying animal and vegetable matter. This statute is based upon that fact and was intended to furnish a remedy in cases where such diseases are spreading, and men, women and children are stricken down and dying in consequence of noxious effluvia from decaying matter and filth in the vicinity. In such cases there is absolute necessity for immediate action. There is no time to resort to the courts to determine whether the supposed nuisances are so in fact, and are destroying life and health in the vicinity. During such delay an entire village might become depopulated. What shall be done? Life and health are to be considered on the one side, and what value there may be in nuisances and filth on the other. Life and health are to be preserved at the cost of nuisances and filth. The statute does not mean to destroy property which is not in fact a nuisance, but who shall decide whether

Raymond *v.* Fish.

it is so? All legal investigations require time, and cannot be thought of. If the board of health are to decide at their peril, they will not decide at all. They have no greater interest in the matter than others, further than to do their duty; but duty, hampered by a liability for damages for errors committed in its discharge, would become a motive of very little power.

It would seem to be absolutely necessary to confer upon some constituted body the power to decide the matter conclusively, and to do it summarily, in order to accomplish the object the statute has in view. We think this has been done. We think the board of health of the town of Groton had the power to decide conclusively, in the apparent necessities of the case, that the brush in Pequonock river was a nuisance, endangering the life and health of the inhabitants of the village.

If we examine the different sections of the act "for the preservation of the public health and safety," we shall find great powers conferred upon the board of health in regard to other matters than those here in controversy. They may order any vessel into quarantine whenever they deem it expedient for the public safety. They may order any vessel to be cleansed and purified in a certain manner whenever they consider it necessary; and if such vessel shall contain any person ill with any contagious or infectious disease, they may order such person, and any other person or persons on board, to be secluded for the space of fourteen days, whether such other persons are ill at the time or not. They may interdict communication between different towns or places, whenever any contagious or malignant disease is prevalent in one of them. They may order any person whom they may have reasonable ground to believe to be infected with any malignant, infectious or contagious disease, into confinement in any place to be designated by them, there to remain so long as the board shall judge it to be necessary. These powers, and many others that may be found in the statute, have their origin in the urgent necessities of the case. Disease makes its ravages, and it **must**

be met by extraordinary measures, and all persons must submit to what is absolutely necessary to stay its progress These powers conferred upon the board are as injurious to those upon whom they are exercised as those involved in the present controversy, to say the least. A vessel must go into quarantine at the bidding of the board, no matter how great may be the loss to the owners. A person must go into seclusion for the space of fourteen days, who happens to be found on board a vessel where another is ill with some contagious disease; and if the board have reasonable ground to believe that such person is infected with the same disease, he must go into confinement, at the bidding of the board, in some place designated by them, so long as they shall consider it necessary, however grievous it may be to him, and however great may be his pecuniary loss in consequence.

The powers of the board in these respects cannot be questioned, for they are expressly conferred; and if they are exercised in good faith, and with proper care and prudence, in the manner prescribed by the statute, the board cannot be made responsible for mere errors of judgment, whatever may be the consequence. And we think a like construction must be given to the sections of the act in question in this suit, as we have already intimated. The statute commences by declaring that the board of health " shall have all the powers necessary and proper for the preservation of the public health and the prevention of the spreading of malignant diseases." The second section commences by declaring that it shall be the duty of the board to " examine into all nuisances and sources of filth injurious to the public health, and cause to be removed all filth found within the town which in their judgment shall endanger the health of the inhabitants." Here power is expressly given to decide what constitutes filth, and if they merely err in judgment there can be no redress. This is conceded, but it is said that the statute makes a distinction between nuisances and filth. What distinction there can be in fact in respect to their baneful influence upon contagious and

Raymond *v.* Fish.

malignant diseases it is difficult to see. Poisonous exhalations may come from both, and both may be free from them; in the latter case they will not come within the control of the board. If either is injurious to the public health, it must be so because it sends forth noxious effluvia. Such effluvia could be as easily detected, coming from the one as from the other. There is no reason for the distinction, and we think none exists. Further on in the section it is provided that " when any such filth or nuisance shall be found on private property, such board shall notify the owner or occupant of such property to remove the same at his expense, within such time as the board shall direct," (that is, remove the nuisance as well as the filth;) " and after the expiration of such time such board shall cause such filth or nuisance forthwith to be removed or abated." Here nuisances are classed with the filth first described, where the power to decide with regard to it and order its removal is expressly conferred. What ground is there for any distinction? We see none, and clearly none exists. And further, by the common law a private person has the right to abate a private nuisance that does him harm, without resort to the courts for redress. But in such case he abates at his peril. He cannot justify the act done unless he proves that the supposed nuisance was one in fact. This is the doctrine the plaintiff insists should govern this case. But unless the statute goes farther than this, nothing was accomplished by its enactment, and neighborhoods afflicted with malignant diseases might as well have been left to their rights at the common law.

But it is said that any other construction of the act renders it unconstitutional, and for the reasons that it takes away the right of trial by jury; that it deprives the owner of his property without due process of law; that it confers judicial powers upon a tribunal not warranted by the constitution; and that it takes private property for public use without compensation.

By the common law a party has the right to defend himself from any assailant even to the taking of life when

necessary, and even to the taking of life when not necessary in fact, but apparently so. If life may be protected by destroying life, when apparently necessary but not so in fact, may not life be protected by destroying property when apparently necessary, though afterwards discovered not so in fact? But it may be said that this right of self defence comes when the assailed party seems to be driven to the last extremity. So here, the justification of the board of health in the destruction of property must come in *seemingly* extreme cases, where there is reasonable ground to believe that immediate action is necessary for the preservation of the life and health of the inhabitants, and where there is reasonable ground to believe the supposed nuisance to be one in fact.

We go no farther in this case than its exigencies require. We leave undecided how far the board of health may go in other cases, where the destruction of property may not seem to require such summary action. It is expressly found in the case that the board acted in good faith throughout these transactions, and in addition thereto such facts are detailed as go to show that they acted with extreme caution. We cannot doubt the constitutionality of the act when rightly considered. It is nothing more or less than a police regulation. The property was not taken for public use within the meaning of the constitution. It was destroyed for the protection of the public health.

The cases cited by the plaintiff throw but little light upon the question we are considering. They are based upon statutes differing materially from our own, and upon facts raising other questions and other issues than are involved here. The case coming nearest to the present one in its facts and in the principles involved, is that of *City of Salem* v. *Eastern Railway Co.*, 98 Mass., 431, in which the court remarks as follows:—" The authority of the board of health in respect to particular nuisances stands upon similar ground, [that is, that of police regulations.] Their action is intended to be prompt and summary. They are clothed with extraordinary powers for the protection of

the community from noxious influences affecting life and health, and it is important that their proceedings should be embarrassed and delayed as little as possible by the necessary observance of formalities. * * There are many cases in which powers of determination and action, of a quasi judicial character, are given to officers intrusted with duties of local or municipal administration, by which not only the property but the lives of individuals may be affected, and which, from their nature, must be exercised, finally and conclusively, without a hearing, or even notice to the parties who may be affected. Of this class are the authority of fire-wardens or other officers to direct buildings to be demolished to prevent the spreading of fires; of magistrates to require aid, and to use force, armed or otherwise, to suppress tumults; of the mayor or other officers to call out the military force for the like purpose. * * We think these principles apply to the proceedings of a board of health. Their determination of questions of discretion and judgment in the discharge of their duties is undoubtedly in the nature of a judicial decision; and within the scope of the powers conferred, and for the purposes for which the determination is required to be made, it is conclusive. It is not to be impeached or set aside for error or mistake of judgment; nor to be reviewed in the light of new or additional facts. The officers or board to whom such determination is confided, and all those employed to carry it into effect, or who may have occasion to act upon it, are protected by it, and may safely rely upon its validity for their defence. It is in this sense that such adjudications are often said to be conclusive against all the world; and they are so, so far as the *res* is concerned." We think the act is constitutional.

We think there is nothing in the claim that the board that passed the vote declaring the brush a nuisance and injurious to the public health on the 8th day of December, was a different board from the one that passed a similar vote on the 10th day of August of the same year, because it was composed of some new members who had been

elected in the meantime. The board was the same, although all the members might be different. As well might it be claimed that the Superior Court changes as often as different judges preside.

The board being the same, it might well act in December upon what it had done in August preceding.

We further think that there was no error committed by the board in removing the brush in December, when it did not at that time endanger the life or health of the inhabitants. The board refrained from removing the brush in August, when the first vote of removal was passed, through fear that by so doing the poisonous effluvia would be greatly increased, and the malady which then prevailed would be aggravated in proportion. It became necessary, therefore, to remove the brush when it could be done in safety to the public health. And further, the brush was removed in December to prevent a recurrence of the malady the following summer. It was reasonable to suppose, if the brush, with the oysters upon it, had caused the contagious and malignant diseases that afflicted the village during the summer preceding, it would occasion like results the following summer. We think there was no error in this regard.

Complaint is made that the defendants destroyed the oysters as well as the brush. But the facts of the case furnish no foundation for this complaint. The court has found that the defendants did no unnecessary damage. This is equivalent to finding that the oysters were so attached to the brush that separation could not be made. We think there is nothing in this claim.

We advise judgment in favor of the defendants.

In this opinion the other judges concurred; except GRANGER, J., who dissented.