7281

KIRK v. BOARD OF HEALTH.

1. HEALTH BOARDS—POLICE POWER—JURISDICTION.—PRINCIPLES OF CON-
STITUTIONAL LAW governing health regulation by statute and
municipal ordinance, powers conferred on boards of health, remedy
by individuals for protection against invasion of personal or property
rights by health officers not essential to public health, and the juris-
diction of Courts in reviewing the regulations and actions of health
boards stated.
   MR. JUSTICE HYDRICK *thinks the principles are stated too broadly.*
2. CONSTITUTIONAL LAW—NOTICE.—A BOARD OF HEALTH gives an indi-
vidual notice and opportunity to be heard by serving on her its
resolutions pertaining to her case, receiving her communications in
response thereto, and hearing her physician state her views.
3. INJUNCTION.—BOARD OF HEALTH held to be well within its duty in
isolating a case of anæsthetic leprosy, but the victim having made
a *prima facie* showing that the manner of isolation determined upon
is clearly beyond what is necessary to the public protection, the
Court ought to enjoin it as arbitrary.
   MR. JUSTICE HYDRICK *dissents.*
4. DAMAGES.—MEMBERS OF BOARDS OF HEALTH are not personally liable
for errors in their official conduct where they exercise their honest
judgment.

Before ALDRICH, J., Aiken, February, 1909.    Affirmed.

Action by Mary V. Kirk against H. H. Wyman, M. D.,
*et al.,* as the Board of Health of the City of Aiken. From
Circuit order, temporarily restraining the board from
removing the plaintiff to the pest house, the defendants
appeal.

*Messrs. Hendersons,* for appellant, cite: *Ministerial acts
of board of health should not be restrained:* 67 S. C., 93;
54 S. C., 454; 73 S. C., 411; Code, 1902, 1099, 1100.
*Legislature may delegate power to municipality to pass
such ordinance:* 123 U. S., 623.    *Court can not consider if
it is reasonable:* 48 S. C., 570; 76 S. C., 129; 38 S. C., 495;
82 S. C., 141; 76 S. C., 403; 81 S. C., 414; 21 Cyc., 404;

Tiedeman on State & Fed. Con. of Per. & Prop., secs. 17, 44; Throop on Pub. Of., secs. 558, 562, 567, 842, 843. *Discretion of board of health should not be interfered with:* 25 S. C., 114; 16 Cyc., 45, 48; Throop, secs. 724, 726; 5 S. E. R., 202; 53 Am. R., 764; 32 Am. St. R., 113; 37 Am. St. R., 552; 102 Id., 983; 96 Am. Dec., 660.

*Messrs. Croft & Croft, Sawyer & Owens* and *J. K. P. Bryan,* contra. *Messrs. Croft & Croft* and *Sawyer & Owens* cite: *One's liberty can not be taken without due process of law:* Dill on Mun. Corp., 142; Cool. Con. Lim., 16; 95 U. S., 714; 8 A. & E. R. R. Cas., 27; 74 N. Y., 234; 17 L. R. A., 223; 47 Barb., 64; 33 How. Pr., 7; 31 How. Pr., 385; 49 Barb., 450; 125 Mass., 182; 135 Mass., 526; 132 Mass., 71; 9 C. E. Green, N. J., 119; 31 Barb., N. Y., 247; 26 Fed. R., 611; 31 Fed. R., 680; Dill. Mun. Corp., 142; 136 U. S., 313; 138 U. S., 78; Cool. Con. Lim., 353; 23 A. R., 208; 4 Zabr, 222; 18 Pick., 393; 11 Mass., 507; 1 Gray, 1; 98 Mass., 431; 9 C. E. Green, 169; 8 Ill., 251; 65 Me., 126; Smith on Corp., par. 1675; 47 N. Y. Supp., 623; 31 Barb., 447; 8 Col. App., 113; 23 A. R., 209; 24 N. J. Eq., 169; 15 Wend., 262; 81 Pa. St. R., 80; 7 Phil., 82; 3 Pa. L. J., 268; 8 Allen, 325; 116 Mass., 254; 98 Mass., 431; 64 A. R. K., 609; 1 Marr., 215; 51 A. S. R., 86; 79 Ga., 807; 32 A. S. R., 113; 3 A. S. R., 850; 37 A. S. R., 522; 37 N. C., 661; 21 N. Y., App. Div., 420; 38 L. R. A., 305; 102 A. S. R., 983; 21 Cyc., 399. *When public officers will be enjoined:* 22 Cyc, 879, 882, 763, 771; 31 Barb., 447; 11 A. R., 21; 3 Grant Cas., 390; 74 Ga., 507. *Complaint in effect alleges wilfulness:* 101 Mass., 243; 52 S. C., 296.

*Mr. J. K. P. Bryan* cites: *When temporary injunction should be granted:* 69 S. C., 156; 62 S. C., 196; 74 S. C., 178; 75 S. C., 220. *When case is made warranting injunction:* 69 S. C., 156; 54 S. C., 435; 60 S. C., 391; 62 S. C.,

196; 72 S. C., 90; 5 Wall., 74; 136 U. S., 311; 16 Ency., 354, 355; 158 U. S., 583. *How police power is to be exercised:* 53 S. C., 278; 4 Ency., 600, 602. *Acts of health bodies can be reviewed by the Court:* 72 S. C., 90; 164 U. S., 481; 195 U. S., 223; 106 N. W., 697; 2 Dill. Mun. Corp., secs. 409, 410; 2 High on Inj., 969, 974, 993; 4 Ency., 602, 603; 10 Wall., 497; 106 N. W., 697; 5 L. R. A. (N. S.), 635.

August 19, 1909.   The opinion of the Court was delivered by

MR. JUSTICE WOODS.   The board of health of the city of Aiken, after investigation, reached the conclusion that Miss Mary V. Kirk, a resident of the city, was afflicted with leprosy, contagious in its nature, and passed resolutions requiring her to be removed to the city hospital for infectious diseases.   Thereupon Miss Kirk brought this action for injunction, alleging in her complaint that, although she is a victim of leprosy, it is of the kind known as anæsthetic and not dangerous to the community; that she is a woman of culture and refinement, and that the place to which the board of health requires her to be removed is the city pest house, coarse and comfortless, used only for the purpose of incarcerating negroes having smallpox and other dangerous, and infectious diseases; that the house adjoins the city dumping grounds, where the offal of the city is deposited, from which arise foul and unhealthy odors.   Judge Aldrich on the complaint issued a temporary restraining order, and required the board of health to show cause why a temporary injunction should not be granted pending the hearing of the cause.   As a return the board of health submitted their answer, alleging: (1) that the leprosy afflicting the plaintiff is contagious and dangerous to the community; (2) that they had resolved on compulsory isolation outside of the city only as a last resort, after Miss Kirk had refused to leave the city; (3) that the city council at their instance

have put the city hospital in good condition and repair for Miss Kirk's temporary abode, and have promised to build for her a comfortable cottage, supplied with all modern conveniences, as soon as the work can be done; (4) that while the city dumping grounds are about one hundred yards from the hospital, the foul offal is not deposited there, and foul and unhealthy odors do not arise from it; (5) that they have discharged what they consider to be their duty under the law with humanity and courtesy. After hearing many affidavits from both sides, bearing on the issues thus made, Judge Aldrich granted a temporary injunction, restraining the board of health from removing the plaintiff to the city hospital or pest house. The order contained, however, this condition: "This order is not to be understood as interfering with the board of health in maintaining such quarantine regulations as they may deem necessary for the public safety." The board of health appealed.

The order of injunction rests on the finding by the Circuit Judge that the city hospital or pest house is unfit for the habitation of such a patient, by reason of want of water supply and heating arrangements and the proximity to the city dumping grounds. The appeal being from a mere temporary injunction with the hotly contested issues of fact depending on affidavits only, we shall consider no matters of law or fact, except such as are absolutely necessary to decide whether the temporary injunction should be maintained.

The State Constitution thus provides for the creation of boards of health: "It shall be the duty of the General Assembly to create boards of health wherever they may be necessary, giving to them power and authority to make such regulations as shall protect the health of the community and abate nuisances." Article VIII, section 10. All the statute law relating to boards of health was re-enacted and incorporated in chapter 8, article I, Civil Code of 1902, and, therefore, should be referred to the duty to legislate

on the subject, imposed by the Constitution of 1895 on the General Assembly. Municipal boards of health, therefore, are to be considered as deriving their authority to isolate infected persons from the section of the Constitution above referred to, and from section 1099 of Civil Code, which provides: "The said board of health shall have power and it shall be their duty to make and enforce all needful rules and regulations to prevent the introduction and spread of infectious or contagious diseases by the regulation of intercourse with infected places, by the arrest, separation and treatment of infected persons, and persons who shall have been exposed to any contagious or infectious diseases, and by abating and removing all nuisances, which they shall deem prejudicial to the public health, to enforce vaccination, to mark infected houses or places, to prescribe rules for the construction and maintenance of house drains, waste pipes, soil pipes and cesspools, and make all such other regulations as they shall deem necessary for the preservation of the public health. They shall also have power, with the consent of the town or city council, in case of the prevalence of any contagious or infectious diseases within the town or city, to establish one or more hospitals and to make provisions and regulations for the management of the same."

Complaint was made about the 8th of December, 1908, that Miss Kirk was afflicted with leprosy. The board came to the conclusion that the complaint was well founded, that the leprosy was contagious, and that it was necessary to the public health that Miss Kirk should leave the city or be isolated in the city hospital or pest house until a more suitable abode could be provided for her. The first resolution was passed on the 13th of December, 1908, in these terms: "Resolved, That we notify Miss Kirk, her friends and practicing physician, that we will move her out to the city hospital if she is not moved out of the city in ten days from the date of service." Notice of this resolution was given

to Miss Kirk, but at the request of Dr. Croft, Miss Kirk's physician, the board reconsidered the matter and entered upon a diligent inquiry as to the nature of the disease and the necessity of isolation, calling to their aid Dr. Croft and all the physicians of the city. The investigation did not change the board's conclusion. On the 28th of December, and again on the 29th, Miss Kirk wrote to the board, submitting to its action and acquiescing therein, on condition that she should have a white caretaker.

The following extracts from the minutes of the board of health indicate their formulated rule, after having had the matter under consideration from the 5th of December 1908, to the 13th of January, 1909:

"The matter of Miss Kirk was taken up and discussed. The secretary reported that the resolution adopted asking council to erect a cottage for Miss Kirk had been placed before the mayor and council, and that body had agreed to erect such cottage as soon as practicable, and the mayor had so informed Miss Kirk.

"The following was then introduced and adopted as a part of the rules and regulations of the board of health: 'Resolved by the board of health for the city of Aiken, That pursuant to the law giving us the power thereto, that we do hereby adopt the following rule and regulation:

" 'In order to prevent the introduction and spread of infectious or contagious diseases in the city of Aiken, that wherever any person is known to have any contagious or infectious disease and if they enter the town having such they be commanded immediately to leave the city, and if they do not that they be quarantined until they can be removed, and in case any such person or persons is found within the city of Aiken affected with any such infectious or contagious disease, that they be notified to leave, and if they do not leave within a reasonable time or their relatives and friends do not take them away, then and in such case that an order may be issued by the board of health to the

health officers, or any of the policemen of the city, to take such party in charge and remove them to the city hospital for infectious diseases, or such other place as may be designated by the board of health.' "

On the 18th of January, 1909, the board resolved: "That Miss Kirk be removed out to the city hospital today, provided her health permits." Subsequently, on the same day, Dr. Croft gave to the board a certificate: "I have this day visited Miss Kirk, and find that she is very nervous and has been quite sick all night, and think that it is advisable that she be not removed at present."

Three days thereafter, on the 21st of January, 1909, the complaint for injunction and the order to show cause were served on the board of health.

The principles of constitutional law governing health regulations by statute and municipal ordinance may be thus stated: First, statutes and ordinances requiring the removal or destruction of property or the isolation of infected persons, when necessary for the protection of the public health, do not violate the constitutional guarantee of the right of the enjoyment of liberty and property, because neither the right to liberty nor the right of property extends to the use of liberty or property to the injury of others. The maxim, *sic utere tuo ut alienum non leadas* applies to the person as well as to the property of the citizen. The individual has no more right to the freedom of spreading disease by carrying contagion on his person than he has to produce disease by maintaining his property in a noisome condition.

Second, the State must of necessity lodge the power somewhere to ascertain in the first instance, and act with promptness when the public health is endangered by the unhealthful condition of the person or the property of the individual; and the creation by legislative authority of boards of health, with the discretion lodged in them of summary inquiry and action, is a reasonable exercise of

the police power. From this it follows that the rules and resolutions within the scope of the authority of such boards have the force of legislative enactment. The conferring of such power on boards of health is not, however, a delegation of the State legislative power lodged by the Constitution exclusively in the General Assembly; it is merely the providing of the agency for carrying out the legislative enactment. In this State the exercise of such powers by boards of health has the still higher sanction of a constitutional requirement that "the General Assembly shall create boards of health, and give them power and authority to make such regulations as shall protect the health of the community and abate the nuisance."

Third, Arbitrary power over persons and property could not be conferred on a board of health, and no attempt is made in the Constitution or Statutes to confer such power. On the contrary, it is implied in all such legislation that the board shall exercise the police power conferred in view of the constitutional guaranty that no person shall be deprived of life, liberty or property without due process of law, or be denied the equal protection of the laws. It is always implied that the power conferred to interfere with these personal rights is limited by public necessity. From this it follows that boards of health may not deprive any person of his property or his liberty, unless the deprivation is made to appear, by due inquiry, to be reasonably necessary to the public health; and such inquiry must include notice to the person whose property or liberty is involved, and the opportunity to him to be heard, unless the emergency appears to be so great that such notice and hearing could be had only at the peril of the public safety.

Fourth, To the end that personal liberty and property may be protected against invasion not essential to the public health,—not required by public necessity,—the regulations and proceedings of boards of health are subject to judicial review, by an action for damages or for injunction or other

appropriate proceedings, according to the circumstances. In passing upon such regulations and proceedings, the Courts consider, first, whether interference with personal liberty or property was reasonably necessary to the public health, and, second, if the means used and the extent of the interference were reasonably necessary for the accomplishment of the purpose to be attained.

Fifth, In exercising the jurisdiction to review the regulations and actions of such boards by injunction or other proceedings, the Courts cannot invade the province of the legislative branch of the government. Inasmuch as it is the province of the legislative branch to determine what laws and regulations are necessary to the public health, statutes and regulations made, and measures taken under such statutes, and intended and adapted to that end, are not subject to judicial review. But the Courts must determine whether there is any real relation between the preservation of the public health and the legislative enactment, or the regulations and proceedings of boards of health under authority of the statute. If the statute or the regulations made or the proceedings taken under it are not reasonably appropriate to the end in view, the necessity for curtailment of individual liberty, which is essential to the validity of such statute and regulations and proceedings, is wanting, and the Courts must declare them invalid, as violative of constitutional right.

Sixth, In all judicial inquiry, with respect to health, laws and regulations, every intendment is to be allowed in favor of the validity of the statute and the lawfulness of the measures taken under it.

Citation is unnecessary of all the cases in which is discussed the police power, as related to the powers exercised by the various kinds of administrative boards created by constitutional and statutory authority. With respect to the extent to which the action of such boards is subject to judicial review, and the manner in which judicial review may

be obtained, the Courts are not in entire agreement. The principles we have stated seem to us to be in accord with the adjudications of our own Court, and of the Supreme Court of the United States, and with well considered decisions in other States. The following authorities have special application to the points involved in this case: *Port Royal* v. *Hagood,* 30 S. C., 526, 9 S. E., 686; *State* v. *Morehead,* 42 S. C., 217, 20 S. E., 544, 26 L. R. A., 585; *Darlington* v. *Ward,* 48 S. C., 582, 26 S. E., 956, 38 L. R. A., 326; *State* v. *Earle,* 66 S. C., 194; *Brunson* v. *Youmans,* 76 S. C., 128, 56 S. E., 651; *Chy Lung* v. *Freeman,* 92 U. S., 275, 23 L. Ed., 550; *Minnesota* v. *Barber,* 136 U. S., 313, 34 L. Ed., 453; *Dobbins* v. *Los Angeles,* 195 U. S., 223, 49 L. Ed., 169; *Jacobson* v. *Mass.,* 197 U. S., 11, 49 L. Ed., 643; *People* v. *Board,* 140 N. Y., 1, 37 Am. St., 523; *Belmont* v. *New England Brick Co.* (Mass.), 77 N. E., 504; *Blue* v. *Beach* (Ind.), 56 N. E., 89, 80 Am. St., 195, and note; *Jew Ho* v. *Williamson,* 103 Fed., 10, 92 Am. Dec., 76, note; 21 Cyc., 404.

In applying these principles, it is to be borne in mind that the case under consideration is unusual, imposing upon the Aiken board of health a delicate and unpleasant duty. Miss Kirk is not only a lady of refinement, highly esteemed in the community, but she is quite advanced in years.

The proceedings of the board show clearly their solicitude to treat Miss Kirk with courtesy and consideration. There is no foundation for the charge that they did not give her notice, and an opportunity to be heard, for in response to the notice of the board, she sent communications to them, and her physician, Dr. Croft, appeared and presented her view of the matter. It was not to be expected that the board should assume the peril from the contagion to themselves and others, which a personal hearing would have entailed.

That Miss Kirk is afflicted with anæsthetic leprosy contracted while engaged in missionary work in Brazil is

admitted.    While there is a strong showing that the anæsthetic form of the disease is only slightly contagious, when the distressing nature of the malady is regarded, it seems manifest that the board were well within their duty in requiring the victim of it to be isolated. The case then turns on whether, under the principles above stated, plaintiff has made a *prima facie* showing that the manner of the isolation was so clearly beyond what was necessary to the public protection, that the Court ought to enjoin it as arbitrary.    The evidence furnished of the opinions of both specialists and general practitioners of medicine was quite full, and leads to the conclusion that there is hardly any danger of contagion from Miss Kirk, except by touch or at least close personal association.    What is more important than these opinions is the uncontroverted fact that Miss Kirk has for many years lived in the city of Aiken attended church services, taught in the Sunday school, mingled freely with the people, in social life, relying on the opinion of Dr. Hutchinson, a distinguished London specialist, that her disease was not contagious; and in all that time there has been nothing to indicate that she has imparted the disease to any other person.    Was there any necessity to send such a patient to the pest house?    The board of health had established a strict quarantine of her dwelling, and there was no evidence that Miss Kirk had made any effort to violate it.    The maintenance of this quarantine, we can not doubt, afforded complete protection to the public.    It is true the board could not be expected to maintain a permanent quarantine of a house in the heart of the city of Aiken; but the city council had agreed to build for the purpose of isolation a comfortable cottage outside of the city limits, which could have been completed in a short time.

There is some conflict in the affidavits as to the condition of the pest house, but it is not denied that it is a structure of four small rooms in a row, with no piazzas, used heretofore for the isolation of negroes with smallpox, situated within a

hundred yards of the place where the trash of the city, except its offensive offal, is collected and burned.   The smoke from this pile is blown through the house.   The board of health, it is true, have made it less uncomfortable by painting and some other work.   But with this improvement, we are forced to the conclusion that even temporary isolation in such a place would be a serious affliction and peril to an elderly lady, enfeebled by disease and accustomed to the comforts of life.   Nothing but necessity would justify the board of health in requiring it, and we think there is a strong *prima facie* showing that there was no good reason to conclude that such necessity existed.

We agree with the Circuit Judge also on the point that an action for damages against the members of the board of health as individuals would not afford the plaintiff an adequate remedy.   In some jurisdictions it has been held that the members of a board of health incur personal liability for a mistake in destroying property on the ground that it is dangerous, when in fact it is not. *Miller* v. *Horton* (Mass.), 10 L. R. A., 116, 23 Am. St., 850, 26 N. E., 100; *Lowe* v. *Conroy* (Wis.), 66 L. R. A., 907, 102 Am. St., 983, 97 N. W., 942; *Pearson* v. *Zehr* (Ill.), 32 Am. St., 113, 29 N. E., 854; *People, ex rel. Copcutt* v. *Board of Health* (N. Y.), 23 L. R. A., 481, 37 Am. St., 523, 35 N. E., 320.   The contrary is held in *Raymond* v. *Fish,* 51 Conn., 80, 50 Am. Rep., 3; *Whidden* v. *Cheever* (N. H.), 76 Am. St., 154, 44 Atl., 908; *Compagnie Francaise de Nav.* v. *State Bd. of Health,* La., 56 L. R. A., 795, 72 Am. St., 458, 25 So., 591; *Forbes* v. *Bd. of Health* (Fla.), 13 L. R. A.. 549, 9 So., 862.   In this State it must be held on the authority of *White* v. *City of Charleston,* 2 Hill, 576, that the members of a board of health are not personally liable for errors in their official conduct, when they exercise their honest judgment.   Personal liability depends on proof of bad faith. True, bad faith may be shown by evidence that the official action was so arbitrary and unreasonable that it could not

have been taken in good faith, but there is no such showing in this case. Even if there were such showing, the remedy by action for damages would not be adequate where the health or life of the citizen is by force unnecessarily imperilled. Protection from the loss of health or life is the only adequate relief in such case.

We can not too strongly emphasize the caution which Courts should exercise in entertaining applications for injunction against boards of health, yet careful consideration of the record leads us to the conclusion that this is an exceptional case, and that the order for the temporary injunction, carefully guarded as it was in its terms, was not improvidently made.

The judgment of this Court is, that the judgment of the Circuit Court should be affirmed.

Mr. Justice Hydrick *dissenting:* I feel constrained to dissent from the decision of the Court in this case.

In the main, I concur in the statement of the principles of the law applicable in the consideration by the Courts of municipal ordinances and regulations of boards of health, as laid down by Mr. Justice Woods. There are, however, some expressions contained therein which are susceptible of a construction which would make his statement of the principles applicable in such cases conflict with the previous decisions of this Court, and which, if such construction is proper, may prove subversive of the power and authority conferred upon these bodies by the Constitution and statutes.

In the fourth subdivision of his statement of the law, he says: "In passing upon such regulations and proceedings, the Courts consider, first, whether interference with personal liberty or property was reasonably necessary to the public health, and, second, if the means used and the extent of the interference were reasonably necessary for the accomplishment of the purpose to be attained." In the fifth subdivi-

sion, he says: "If the statute or the regulations made or the proceedings taken under it are not reasonably appropriate to the end in view, the necessity for the curtailment of individual liberty, which is essential to the validity of such statutes and regulations and proceedings, is wanting, and the Courts must declare them invalid, as violative of constitutional right."

This Court has held in a number of cases that, within the scope of the power conferred upon them by the Constitution and statutes, these bodies are the exclusive judges of the necessity of police regulations adopted by them, and of the means necessary and proper to enforce them. Within the scope of their powers, their action is legislative, as well as administrative, and the Courts have no power to inquire whether it is necessary, reasonable, or appropriate to the end in view, unless, and only in so far as, such inquiry may be necessary to enable the Courts to determine whether rights guaranteed by the Constitution, State or Federal, have thereby been invaded. The Courts will not be misled by a mere subterfuge; hence, in order that rights guaranteed by the Constitution may not be violated under the form and pretense of police regulations, the Courts will inquire whether there is any real and substantial relation between such regulations and the manner of their administration and the avowed purpose sought to be accomplished. If the language above quoted means no more than that the Courts may inquire into the reasonableness or necessity of such regulations and into the manner of their administration, and consider these, in so far as such inquiry and consideration may serve to enable the Courts to decide whether there is any real and substantial relation between such regulations and the manner of administering them, and the avowed purpose sought to be attained, and hence whether they are *bona fide* exertions of the police power, or mere pretenses, under cover of which constitutional rights are invaded, then I think the statement correct. But if it is meant that the Courts can

go further and, after having discovered the existence of
some real and substantial relation between such regulations
and the method of enforcing them and the end sought to be
attained, set their judgment up against that of the municipal
corporation or board of health as to the appropriateness,
reasonableness or necessity of such regulations,—when they
do not invade any constitutional right,—then I do not think
it a correct statement of the law. If there is such an inti-
mate relation between the law and the avowed purpose of it
that reasonable men might differ as to the necessity, reason-
ableness or wisdom of the law, the Courts are bound by the
judgment of the law-makers, unless the law conflicts with
the Constitution. But of course if no such relation appears
to exist between the law and its administration and the end
to be attained; or if such relation is so slight that, consider-
ing its effect and operation and the manner of its administra-
tion, reasonable men could not differ in the opinion that the
real purpose and intent of the law is to evade some provision
or guaranty of the Constitution, under a mere pretensive
exercise of the police power; or if it does, in fact, in its
necessary operation and effect, conflict with the Constitution,
then the Courts may hold it void, as being in excess of the
power granted, or in violation of the Constitution. Upon
this view, many apparent conflicts in the decisions may be
reconciled; for the Courts are generally agreed that large
powers and discretion must be vested in municipal bodies
and boards of health in regulating the police, and that every
intendment will be indulged in support of their actions, and
they will not be declared void, unless they are clearly in
excess of the powers conferred, or a palpable invasion of
rights guaranteed by the Constitution.

In some States, the Courts have declared municipal ordi-
nances and regulations of boards of health void, because they
were unreasonable or unnecessary to the public safety. But
upon careful examination of the cases, it will be found that,
in the great majority of them, they were said to be unreason-

able or unnecessary, because they were in excess of the
powers granted, or in conflict with constitutional provisions.

1 Dill, Mun. Corp. (4 Ed.), secs. 94, 319, 328.    "The
judgment of the Court can not be substituted for the judg-
ment of the board of health."    *Naccari* v. *Rappelet.* 119,
La., 272, 13 L. R. A. (N. S.), 640; *Ruhstrat* v. *People,* 185
Ill., 133, 76 Am. St. Rep., 30, and note; *Booth* v. *People,*
186 Ill., 43, 78 Am. St. Rep., 229.    "If no state of circum-
stances could exist to justify such a statute, then we may
declare this one void, because in excess of the legislative
power of the State.    But if it could, we must presume it did.
Of the propriety of legislative interference, within the scope
of legislative power, the legislature is the exclusive judge."
*Munn* v. *Ill.,* 94 U. S., 113, 24 L. Ed., 86; *Barbier* v. *Con-
nolly,* 113 U. S., 27, 28 L. Ed., 924; *Soon Hing* v. *Crowley,*
113 U. S., 703, 28 L. Ed., 1145; *Mugler* v. *Kansas,* 123 U.
S., 623, 31 L. Ed., 205; *Powell* v. *Pennsylvania,* 127 U. S.,
678, 32 L. Ed., 253.    It may be observed also, that with
regard to the extent to which the Court will inquire into the
reasonableness or necessity of such a law, the Courts place
laws regulating lawful business enterprises in a class sepa-
rate and distinct from those enacted to protect the public
health.    Compare *Dobbins* v. *Los Angeles,* 195 U. S., 223,
49 L. Ed., 169, with *Jacobson* v. *Massachusetts,* 197 U. S.,
11, 49 L. Ed., 643.    I have cited these decisions of the
Supreme Court of the United States, to show that upon this
point the decisions of that Court are in accord with the deci-
sions of this Court, because, where Federal questions are
involved, the State Court is bound to follow the decisions of
the Federal Supreme Court.

This Court has held, time and time again, that it has no
power to declare a police regulation void, because it is unrea-
sonable or unnecessary.    *City Council* v. *Heisenbottle,* 2
McM., 233; *City Council* v. *Goldsmith,* 2 Speer, 428; *City
Council* v. *Ahrens,* 4 Strobh., 291; *City Council* v. *Baptist
Church,* 4 Strobh., 306; *Town of Summerville* v. *Pressly,*

33 S. C., 56, 11 S. E., 545, 8 L. R. A., 854; *Town of Dar-lington* v. *Ward,* 48 S. C., 570, 48 S. E., 906, 38 L. R. A., 326; *Town of Brunson* v. *Youmans,* 76 S. C., 128, 56 S. E., 651.

In *Town of Summerville* v. *Pressly,* the Court, on page 61, says: "Assuming for the present that the town council had the power to pass the ordinance, no question can be made whether a nuisance had been created, nor whether the restrictions complained of were necessary to accomplish the purposes in view. It was their exclusive right to judge what was 'necessary and requisite' to preserve the health of the town." Again, at page 63, "We suppose that the culti-vation inhibited, must have been considered dangerous to health in the locality of Summerville. But, be that as it may, it was a question for the law-making body." On page 64, the Court quotes, with approval, the following from *Harrison* v. *Baltimore,* 1 Gill, 264: "Of the degree of neces-sity for such municipal legislation, the mayor and city coun-cil of Baltimore were the exclusive judges. To their sound discretion is committed the selection of the means and man-ner (contributory to the end) of exercising the power which they might deem requisite to the accomplishment of the objects of which they were made guardians." Similar expressions, as directly in point, will be found in each of the cases above cited.

The principal ground of my dissent, however, is upon the point upon which the decision is mainly rested, to wit: whether "plaintiff has made a *prima facie* show-ing that the manner of the isolation was so clearly beyond what was necessary to the public protection, that the Court ought to enjoin it as arbitrary."

While I do not think the circumstances demanded precipi-tate action by the board, and while they might, perhaps, with little danger to the public, have allowed Miss Kirk to remain in her own home until they could have provided a more suit-able place for her than the pest house, still of that they were

the exclusive judges, unless their action involved an uncon-
stitutional invasion of her liberty.   In view of what has
been said, perhaps I should say that in my opinion, the board
treated Miss Kirk with the greatest kindness and considera-
tion, as, indeed, they should have done, for her unfortunate
condition certainly appeals most strongly to the kindest
sentiments of humanity.

But considering the situation from the point of view of the
board, as well as from that of Miss Kirk, what could they
have done, under the circumstances, more than they did?
The Court holds that they were within their rights and duty
in ordering her isolation, and that they were not bound to
keep up a perpetual quarantine of her house in the heart of
the city.   Should they have gone forward and built a house
for her?   That might have been a useless waste of time and
money, for they had no way of knowing whether she would
occupy it.   By the time it was done, she might have decided
to leave the city, as she had the right to do, under the ordi-
nance, and as the testimony shows she was contemplating
doing.   Suppose the board had never suggested the idea of
building a more comfortable and convenient house for her,
or suppose they had not had the means to do so, and the pest
house had been the only place where they could isolate her?
Would the Court hold that, because they had no other place,
they could not isolate her there?   But what of the pest-
house?   There is much of opinion in the affidavits *pro* and
*con* as to its fitness for the isolation of Miss Kirk.   Doubt-
less these opinions are more or less colored by the feelings
and prejudices of the witnesses.   The undisputed facts, as
to its character and conditions, are more to the point.   These
show that it is composed of four small rooms, measuring
about 12x12 feet each, in a row, with a hall about four feet
wide along the front.   Each room has door opening into the
hall, and two windows on the opposite side, which are pro-
vided with sash and Venetian blinds.   It is built of dressed
lumber, weather-boarded and ceiled.   The partitions are of

dressed ceiling. The ceiling has shrunk and shows some cracks and knot-holes. The rooms are heated by stoves, which are said to be rickety and rusty. The house has no piazzas. There are no trees or shrubbery around it. It has been used for the isolation of negroes with smallpox, but no case had been there within about two years, and after the last case was discharged, the house was fumigated by the best system known to modern science. It was again thoroughly cleansed and fumigated while being prepared for Miss Kirk, and was painted inside and outside. The dump pile, where the trash from the city, consisting of brush, leaves, waste paper, tin cans, etc., but not the offensive offal, was piled and burned, is about one hundred yards from the house, and when this trash is being burned, the smoke sometimes blows over and through the house. The city council proposed and intended to remove the dump-pile, which could have been done in a day or two.

With this detailed description of the house and its surroundings, the Court is as capable as the witnesses of drawing correct conclusions as to whether the confinement there of an elderly lady, cultured and refined, and accustomed to live in a house equipped with all the modern comforts and conveniences, would have caused her any serious injury. I do not think it would; but granting that it might, it does not follow that the board should be enjoined, *on a mere possibility,* in the exercise of their honest judgment as to what was necessary for the protection of the public health. I dare say there is not a pest-house or hospital in the State, except those in the larger cities, that will afford all, or even many of the comforts and conveniences of a well-equipped modern dwelling house. But that is no reason why one accustomed to live in such a house should have the right to enjoin a board of health from taking him to a less comfortable or convenient place, if he should be afflicted with a contagious disease, and thereby become a menace to the community. Certainly not, unless he can show with reasonable certainty

that it would probably—not possibly—seriously endanger his health or life. The maxim, *"Salus populi est suprema lex,"* is the foundation of all police law, and to it, even rights of property and of liberty, which are protected by the Constitution must give way. When danger threatens the commonwealth, there arises that overruling "necessity" which "knows no law." It is the principle in which authority is found for compulsory vaccination laws, which have been, without exception, so far as I know, sustained by the Courts, notwithstanding the victim is always made more or less sick, and may even suffer death, as a consequence. 1 Tied. St. and Fed. Control Per. and Prop., secs. 17, 44, 169; *Markham* v. *Brown,* 92 Am. Dec., 76, and note; *Morris* v. *Columbus,* 102 Ga., 792, 66 Am. St. Rep., 243; *People* v. *Warden City Prison,* 144 N. Y., 529; *State* v. *Hay,* 126 N. C., 999, 78 Am. St. Rep., 691.

"There is an implied assent on the part of every member of society that his own individual welfare shall, in cases of necessity, yield to that of the community, and that his property, liberty and life shall, under certain circumstances, be placed in jeopardy, or even sacrificed, for the public good." Broom's Legal Maxims (4 Ed.), 49.

I do not go to the extent of saying that if it had been made to appear with reasonable certainty that confinement of Miss Kirk in the Aiken pest-house would have probably resulted in serious injury to her health, the board could have lawfully insisted on confining her there; or if they had, that the Court would not, under the circumstances of this case, have enjoined them. But that is not the case made by the record, from which it appears that there was at least as much, if not more danger to the public from Miss Kirk being in the city than there was to her from confinement in the pest-house. It must be remembered that it was only intended for her temporary abode, until a new cottage could be built, and that the city council proposed and intended to supply the house with water and electric lights, and, from the very commend-

able spirit shown by the board of health and the city council, I have no doubt they would have supplied everything else necessary to make her comfortable.

In dealing with such matters, of necessity and for obvious reasons, a wide range of discretion must be allowed the local authorities, and they should not be interfered with, unless it is clearly made to appear that they have abused that discretion to the probable injury to health or life. The Constitution and statutes have conferred large powers on boards of health, but to what purpose, if they are not allowed to inforce them?

I do not think the plaintiff has made a *prima facie* showing entitling her to injunctive relief, and I think the precedent a dangerous one and unnecessary to the protection of any right of the plaintiff under the law, and, therefore, the order of the Circuit Judge should be reversed.