STATE *EX RELATIONE* THE PORT ROYAL MINING COMPANY
v. HAGOOD.

1. The writ of *mandamus* is the highest judicial writ known to the law, and issues only in cases where there is a specific legal right to be enforced, or a positive possible duty to be performed, and when there is no other adequate remedy.
2. The legislature gave to the Board of Agriculture power to grant or refuse license to mine for phosphate rock in the property of the State, as the board in its discretion may deem best for the interests of the State. The board agreed to issue a license to relators on the performance of certain conditions. *Held*, that the duty imposed upon this board involved discretion, and therefore *mandamus* would not issue. The expression of a willingness to grant the license on conditions, did not so exhaust their discretion as to make it their ministerial duty to issue the license without regard to the conditions.
3. The board were not bound by representations made by a special assistant of that board.
4. It is not the province of the Board of Agriculture to determine the constitutionality of an act defining their powers, nor will the courts, by *mandamus*, decide as to the constitutionality of statutes affecting the rights of third persons.
5. But this statute was neither a delegation of legislative power to the Board of Agriculture, nor in violation of the fourteenth amendment to the constitution of the United States.

Before NORTON, J., Charleston, July, 1888.

This was a petition for *mandamus* instituted by the Port Royal Mining Company against Johnson Hagood and the other members of the Board of Agriculture, in June, 1888. The venue was laid in Barnwell County, where the first named respondent resided, but was heard at chambers before Judge Norton in Charleston, where he was then holding court, on the affidavit of relator's attorney that the judge of the Second Circuit was out of his Circuit, and that the judge then presiding therein had declared himself disqualified.

The Port Royal Mining Company was composed of three corporators, two of whom were members of the firm of W. T. Seward & Co. The special assistant of the Department of Agriculture informed relators by letter, that a license was refused be-

cause applicants were not citizens of this State, nor incorporated under her laws, but if that was done, a license would be granted by the board at their next meeting.

The order refusing the writ was as follows:

I have heard and considered the above stated petition, and the evidence and argument thereon, as carefully as my Circuit duties will permit.

The respondents refuse a license to the relator to mine phosphate rock in lands of which the State is the private as well as public owner. In doing so they were exercising a discretion given to them by statute. The relator insists that the only constitutional discretion provided in the act, *i. e.*, its being a proper person to receive such license, has been decided in its favor by the respondents, who at the same time make two unconstitutional conditions to the issuing of such license, to wit: 1st, that the relator shall pay a certain debt claimed to be due to the State by a company of which two of the members of the relator were members, which debt relator alleges ought to be collected, if owing, out of those who owe it; that the two members in common of the two companies are able to respond to any judgment which the State may obtain thereon; 2nd, that satisfactory arrangements shall first be agreed upon to insure a full accounting for the rock to be mined, relator having a charter to manufacture as well as mine. Relator alleges that this condition is obnoxious to amendment to constitution United States, because not required of other companies chartered to manufacture as well as mine.

I would follow the New York cases if I held that I could not declare the act unconstitutional in order to grant a *mandamus;* but I do not think the act unconstitutional. The authorities cited relate to acts where only the right to exercise certain privileges upon which a general restraint has been laid, not to the disposition, as in the case before me, of private property. For example, the right to sell liquor, not the right to require the government to furnish liquor to be sold. The right to set up a laundry, not the right to use government buildings for that purpose.

If the State could not discriminate in the leasing of its private property, agricultural or mineral lands, and that through an

agent, it could not own them ; they would be profitless. She can only act through an agent. The legislature sits about one-twelfth of the year, and it must have some other agent. Experience has demonstrated this in regard to these very lands.

It is ordered and adjudged, that the petition herein be dismissed.

From this order the relator appealed upon fifteen exceptions which raised the points considered by this court.

*Messrs. Elliott & Howe,* for appellant.

*Mr. Earle,* attorney general, contra.

April 2, 1889.   The opinion of the court was delivered by

MR. JUSTICE McGOWAN.   This was an application to Judge Norton for a writ of *mandamus* against the respondents, requiring them to issue to the relator a license to mine phosphate rock in certain navigable streams of the State, under the following circumstances : The relator is a corporation chartered in this State for "the purpose of mining, dredging, preparing, removing, procuring phosphate rocks and phosphatic deposits, and cleaning, drying, crushing, grinding, and generally dealing in the same in the State of South Carolina," &c.   But having no right to take the phosphate rocks from the beds of navigable streams which belong to the State, they applied to the "Board of Agriculture" for a license for that purpose.   The board refused to grant the license, because they had been informed and believed, that the corporators and owners of the property of the said Port Royal Mining Company are now indebted to the State in a large amount for royalty due the State under a license issued to W. T. Seward & Co., their agents ; and (2) because the said Port Royal Mining Company are operating at the same time both as miners and manufacturers, the respondents deemed it unwise to grant a license to persons who operated in the double capacity of miners and manufacturers, on account of the difficulty in such cases of procuring satisfactory returns of the quantity of rock mined, and the facility with which frauds may be perpetrated against the State.

The respondents, however, made return to the rule that they were willing to grant the license upon the conditions stated in the following resolution : "That it be referred to the commissioner of agriculture, under the advice of the attorney general : first, to procure the payment of the said royalty [referring to the royalty due as aforesaid by W. T. Seward & Co.] in its full amount, and then, and not till then, to grant a license to the applicants to mine : provided further, such regulations are devised and agreed upon, in view of the applicants being manufacturers as well as proposed miners, as will secure a just accounting to the State for royalty on rock to be raised," &c.     The commissioner of agriculture, to whom the matter was referred under the resolution, was unable to devise such regulations as would protect the interests of the State as directed, and the license was not granted.

Thereupon the relator filed this petition to compel the Board of Agriculture to issue the license demanded.     Judge Norton, after argument, denied the writ, upon the ground that to grant the license was not a plain ministerial duty of the board, but was within the discretion given them by the State ; holding also that the act giving such discretion was not unconstitutional.     "The authorities recited relate to acts where only the right to exercise certain privileges upon which a general restraint has been laid, not to the disposition, as in the case before me, of private property.     For example, the right to sell liquors, not the right to require the government to furnish liquor to be sold—the right to set up a laundry, not the right to use government buildings for that purpose," &c.

From this order the relator appeals to this court upon numerous exceptions, which are printed in the "Brief," and need not be restated here.     We think all the points made may be considered under the following propositions : *First.* That it was error to hold that the respondents refused to grant the license in the exercise of a discretion given them by law.     *Second.* But if so, that the act of the legislature purporting to confer such discretion was unconstitutional and conferred no legal authority ; (1) because it was an effort to delegate legislative authority to the Board of Agriculture ; (2) and because the act does not specify the standard to which an applicant for a license must conform, but the

establishment of such standard, and whether an applicant for such license meets the requirements of such standard, are both left to the arbitrary and unregulated discretion of the Board of Agriculture.

Did the Board of Agriculture have the discretion to grant or refuse the application for a license, as in their judgment they deemed best for the interests of the State? The writ of *mandamus* is the highest judicial writ known to the law, and it is well settled that it issues only in cases where there is a specific legal right to be enforced, or where there is a positive duty to be performed which can be performed, and where there is no other specific remedy. "When the legal right is doubtful, or when the performance of the duty rests in discretion, or when there is other adequate remedy, a writ of *mandamus* cannot rightfully issue." See *Ex parte Mackey*, 15 S. C., 330.

Soon after the value of phosphatic deposits became known, the legislature made it an indictable offence to dig or mine phosphatic rocks or deposits without authority, from the beds of the navigable streams and waters of the State; and charged the "Board of Agriculture" "exclusively with the protection of the rights and interests of the State therein." At that time it seems to have been the policy of the State to encourage the granting of licenses "to dig and mine," and in that view an act was passed which required the board "to issue to all citizens of the State and bodies corporate applying for the same, licenses granting a general right to dig and mine phosphate rocks in the navigable streams and waters of the State." See section 67, *General Statutes.* Under this provision it certainly was a plain ministerial duty of the Board of Agriculture to issue licenses for a compensation or royalty to all persons who applied for the same.

But it appears that in 1884 the State changed its policy in reference to these valuable deposits, and passed an act which provides as follows: "That in every case in which applications shall be made to the Board of Agriculture for a license to dig, mine, and remove phosphate rock and phosphatic deposits from the beds of the navigable streams or from the marshes of this State, it shall be within the power and authority of the said board to grant or refuse the said license, as the said board may, in its discretion,

deem best for the interests of the State and the proper management of the interests of the State in such deposits," &c.   18 *Stat.*, 779.   It will be observed that there is no other provision in the act, but it seems to have been passed for the express purpose, as stated in the title, of "defining the powers of the Board of Agriculture," in granting just such licenses as the one in contention in this case.   It seems to us that it would be difficult to frame an act giving larger powers of discretion.

We cannot take the view so earnestly pressed, that the board, by declaring a willingness to grant the license upon the performance of certain conditions, thereby exercised the only discretion allowed them, and (the conditions being disregarded) that nothing remained but the plain ministerial duty of issuing the license.   It seems to us that the transaction was an entirety, and cannot, as suggested, be divided into two separate and distinct acts.   The character of the conditions has nothing to do with the inquiry here.   Under the law, it was for the board to determine, considering all the circumstances, whether it was most for the interests of the State "to grant or refuse the license."   Nor do we think that the special assistant of the department of agriculture had the power to bind the board in the matter of granting licenses, by any representations he could make.   See *City Council* v. *Hollenback*, 3 Strob., 357.

It is insisted, however, that if this be the proper construction of the act of 1884, it is void under the Constitution of the State, and affords no justification for the respondents in refusing the license, for the reason that it was a delegation of legislative powers to the Board of Agriculture.   We have just seen that *mandamus* only lies for the enforcement of a plain ministerial duty, but it is not obvious how that can be a plain duty which is only made to appear by declaring an act of the legislature unconstitutional.   It is not the province of the Board of Agriculture to determine the constitutionality of laws, defining their own powers; nor will the courts, upon summary proceedings in *mandamus*, determine as to the constitutionality of statutes affecting the rights of third persons.   *Ex parte Lynch, trustee*, 16 S. C., 40.

It is undoubtedly true, that legislative power cannot be delegated, but it is not always easy to say what is, and what is not,

legislative power, in the sense of the principle.   The legislature is only in session for a short period of each year, and during the recess cannot attend to what might be called the business affairs of the State.  From the necessity of the case, as well as the character of the business itself, that must be performed by agents appointed for that purpose—such as the railroad commission, regents of the lunatic asylum, the State board of canvassers of elections, sinking fund commission, &c.   The numerous authorities cited in the argument show conclusively, that while it is necessary that the law itself should be full and complete, as it comes from the proper law-making body, it may be, indeed, must be, left to agents in one form or another to perform acts of executive administration, which are in no sense legislative.   Without encumbering this opinion with the authorities, we think the view is well stated in *Locke's Appeal*, 72 Pa. St., 491 : "Then the true distinction, I conceive, is this : the legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend.   To deny this, would be to stop the wheels of government.   There are many things, upon which wise and useful legislation must depend, which cannot be known to the law-making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation."

But it is further claimed, that, although the act of 1884 does not, on its face, make discriminations, yet the absolute discretion which it gives, enables the Board of Agriculture to do so in violation of the 14th amendment of the Constitution of the United States, which, among other things, declares, that "no State shall deny to any person within its jurisdiction the equal protection of the laws."   The relator charges that the board refused to grant to them a license to mine phosphate rocks in navigable streams, for the reason, in part, that the said company was already in the business of manufacturing phosphate rocks ;  and they deemed it unwise to issue a license to those "who operate in the double capacity of miners and manufacturers," while they granted such licenses to "The Sea Island Chemical Company" and "The Carolina Mining Company"—both being at the same time manufac-

turers of phosphates. This was denied as a matter of fact, and we observe that in "the statement of facts agreed upon," is the following: "That neither the 'Sea Island Chemical Company,' nor the 'Carolina Mining Company,' are now engaged in manufacturing fertilizers, nor were they so engaged at the time their licenses were issued, nor were they ever so engaged."

But we do not see how the 14th amendment of the (U. S.) Constitution applies to this case. It was decided in *The State* v. *The Pacific Guano Company* (22 S. C., 84), that the State has in the beds of the navigable tidal waters on the sea coast "not only title as property, the *jus privatum*, but something more, the *jus publicum*," and in reference thereto was charged with "trust duties." Although held for the benefit of the public, we suppose that the State has the exclusive right to control them, and might refuse to grant any licenses to private persons or corporate bodies to mine in them. The relator is not asking to be protected in a right common to all, but to obtain a license to mine in the navigable waters of the State, which is in the nature of a special privilege. The relator company has a charter both to mine and manufacture phosphates, which they may do without any restraint whatever. But, as forcibly stated at the bar, "the right to mine and the right to the mines are essentially different, and so, likewise, is the right to manufacture and the right to procure from the State the materials to be manufactured."

The judgment of this court is, that the judgment of the Circuit Court be affirmed.