13638

STATE *EX REL.* ZIMMERMAN *ET AL.* v. GIBBES *ET AL.*

(172 S. E. 130)

210

*Messrs. John M. Daniel, Attorney General, J. Ivey Humphrey, Assistant Attorney General,* and *Melton & Belser,* for petitioners. ,

*Mr. D. W. Robinson,* for respondent.

May 11, 1933.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

At its 1933 session, the General Assembly passed an Act, approved March 9th of that year (38 St. at Large, p. 1174), vesting the Governor of the State "with plenary powers to assume supervision and control of the Banking Department and the banks of the State of South Carolina, depositories, building and Loan Associations, and all other institutions that accept and pay deposits, subject to the provisions of this Act." Section 1. Section 4 (page 1177), in part, provides: " * * * And all persons, firms or corporations are hereby prohibited, while the Governor is in control of the banks, banking institutions, building and loan associations or cash depositories under the provisions of this Act, from instituting any legal proceedings of any nature whatever against any bank, banking institution, building and loan association or cash depository, * * * without first obtaining the written approval of the Governor. * * * "

Pursuant to the powers granted, the Governor appointed a board of bank control to advise and consult with him;

and later, under authority of the Act, Simpson J. Zimmerman was named as conservator of the Central Union Bank of South Carolina, which has its principal place of business at Columbia.

On April 11, 1933, an action was begun in the Court of Common Pleas for Richland County by Hunter A. Gibbes, "representing himself and all other depositors similarly situated," against Zimmerman, individually and as conservator of the Central Union Bank, the Governor of the State, and others. The plaintiff alleged, *inter alia,* on information and belief, that there was practically no chance of the reopening or the reorganization of the Central Union Bank, that its funds were being depleted by its present management, and that its assets should be liquidated by the orders of the Court and applied to the debts of its depositors and other creditors. The prayer, *inter alia,* was for the appointment of a receiver, for the enforcement of the stockholders' liability, and that the Act of March 9, 1933, "be declared invalid, null and void, in so far as the same undertakes to prevent plaintiff and other depositors of the Central Union Bank from bringing and prosecuting this action."

Judge W. H. Townsend, to whom the matter was presented, issued a rule requiring the defendants to show cause before him on May 4, 1933, why the prayer of the complaint should not be granted, and by his order restrained the defendants in the meantime, "from proceeding in any Court, in any way, in connection with the affairs and assets of the Central Union Bank except in this proceeding."

On April 12, 1933, the present proceeding was instituted in the original jurisdiction of this Court, by the State of South Carolina, in relation to Zimmerman and other defendants named in the original suit, against Hunter A. Gibbes, plaintiff in that suit, the Court of Common Pleas for Richland County, and Hon. W. H. Townsend, Judge of the Fifth Judicial Circuit, seeking a writ of prohibition

"restraining and enjoining them from further proceeding in the said case, and dissolving and dismissing the rule to show cause and temporary restraining order therein issued, and dismissing said suit." On the verified petition this Court granted an alternative writ of prohibition, requiring the respondents to show cause before it, on April 14, 1933, why the relief prayed for should not be granted, and why a final writ of prohibition should not issue. Judge Townsend made formal return, setting out that the Courts of Common Pleas, under the provisions of the State Constitution, have jurisdiction in all civil cases, and original jurisdiction to issue writs of injunction, subject to appeal to the Supreme Court; and that the order to show cause made by him was based upon the complaint, and that the restraining order issued was intended to preserve and maintain the jurisdiction of the State Court in the administration of the affairs of the bank, in the event that the plaintiff established a good cause of action; and further stated that "the Supreme Court now has before it the same information and knowledge that the Court of Common Pleas and the Circuit Judge had at the time of the issuance of said order; and neither the Court of Common Pleas nor said Judge have any knowledge or information as to the merits of said cause, except as set out in the verified complaint, and no interest whatever therein, and will be pleased, because of the interest of a great number of citizens involved, to have this Court assume jurisdiction in the emergency existing, in order that a speedy and final decision may be had thereon."

The respondent Hunter A. Gibbes demurred upon the ground that the petition "does not state facts sufficient to constitute a cause of action of any kind and does not entitle the petitioners to any relief at the hands of this. Court," He also made return and answer, setting forth at length his reasons why the writ should not issue, and praying for dismissal of the petition.

We think the matter may properly and correctly be disposed of by a decision of the questions: (1) Whether the writ of prohibition is here the appropriate remedy; and (2) whether the Banking Act of 1933 is constitutional with especial reference to that portion of Section 4 forbidding the bringing of suits against the banks by any one without the written permission of the Governor. In our discussion of these questions, we shall necessarily refer to, and dispose of, the several contentions of the respondents.

I. We desire, in the outset, to call attention to the very recent case of *Ex parte Jones,* 160 S. C., 63, 158 S. E., 134, 77 A. L. R., 235, where Hon. Mendel L. Smith, Acting Associate Justice, in an able and elaborate opinion, discusses the history and law of prohibition, citing most of the cases in this State dealing with the question. See, also, *Ex parte Wingate,* 166 S. C., 440, 165 S. E., 176, the latest utterance of this Court on the subject.

As the contention that prohibition is an extraordinary prerogative writ and should be resorted to only in cases of necessity, and when there is no other adequate ordinary remedy is conceded, a discussion of that point is unnecessary. See *Ex parte Jones, supra; Ex parte Wingate, supra;* Spelling on Extraordinary Remedies, Vol. 2, § 1727; High on Extraordinary Remedies, § 765. The rule is that, where the Court in which the original action is brought has jurisdiction and the usual remedies provided by law are adequate and complete, the writ should not issue. The respondent Gibbes contends that this proceeding falls within that class; the petitioners, defendants in common pleas, having a full and adequate remedy by appeal. The question, however, whether the remedy is inadequate, is one within the sound discretion of the Court to which application is made for the issuance of the writ, and is to be determined on the facts of each particular case. And in this connection the Court may properly consider the delay and inconvenience incident to appeal, although the inadequacy

of such remedy will not be tested solely by these considerations. It is to be kept in mind that the right of prohibition is defeated, not by the exercise, but by the adequacy, of the remedy by appeal. 50 C. J., 686.

In the case at bar we conclude, upon consideration of the facts before us, that the remedy accorded the petitioners by appeal is not, in the existing circumstances requiring a speedy disposition of the questions presented—to which we shall more particularly hereafter refer —such a completely adequate remedy as would justify the Court in refusing the writ on that ground.

With regard to the contention that a prohibition proceeding is not the proper way of testing the constitutionality of the Act, "it seems to be the rule that the Court will not determine constitutional questions in a prohibition proceeding if the same questions may be raised in another proceeding which will furnish the applicant an adequate remedy." 22 R. C. L., 25. But the appellate Court will not refuse to grant relief by prohibition simply because to do so would necessitate the passing upon a constitutional question. *Bell v. First Judicial District Court,* 28 Nev., 280, 81 P., 875, 1 L. R. A. (N. S.), 843, 113 Am. St. Rep., 854, 6 Ann. Cas., 982, 22 R. C. L., 25. As we have held in this case that a completely adequate remedy by appeal is not afforded the petitioners in the circumstances the necessity for passing upon the constitutional questions raised would not bar relief by prohibition.

It is also urged that the writ should not issue, for the reason that the attention of the inferior Court was not called to its alleged lack of excess of jurisdiction. While it has been held that this is a prerequisite where prohibition is sought, it is also held that the rule is nothing more than a "mere rule of courtesy, and not in any sense rigid." *State of Wyoming ex rel. Poston v. District Court,* 31 Wyo., 413, 227 P., 378, 35 A. L. R., 1082, and note. And the question whether the objection was made

in the Court below is immaterial where the lack of jurisdiction is apparent on the face of the original suit or where the Judge of the inferior Court appears in the prohibition proceeding and asserts his jurisdiction. *State ex rel. Poston v. District Court, supra; Oldroyd v. McCrea,* 65 Utah, 142, 235 P., 580, 40 A. L. R., 230; *State v. Scott,* 1 Bailey, 294. It is evident that this contention is without merit.

II. We turn now to the question of the constitutionality of the Act. It is well established that the banking business is affected with a public interest so as to be subject to legislative regulation and control as a part of the police power of the State (2 R. C. L., 379, 7 C. J., 480, 481); and that the Legislature has authority to prescribe and limit the method and manner of enforcing depositors' rights against the banks and the stockholders thereof. *Graham, Receiver, v. Berry,* 166 S. C., 277, 164 S. E., 755; *Branchville Motor Company v. Adden,* 158 S. C., 90, 155 S. E., 277; *Fischer v. Chisholm,* 159 S. C., 395, 157 S. E., 139; *Ex parte Love,* 158 S. C., 249, 155 S. E., 428.

In *Witt, Receiver, v. People's State Bank,* 166 S. C., 1, 164 S. E., 306, 83 A. L. R., 1068, the Court said: "The regulation of banks and legislation as to insolvent banks are special matters peculiarly within the province of legislative action. 2 R. C. L., 379; 12 C. J., 116; 7 C. J., 10 and 480; *Noble State Bank v. Haskell,* 219 U. S., 104, 111, 31 S. Ct., 186, 55 L. Ed., 112, 32 L. R. A. (N. S.), 1062, Ann. Cas., 1912-A, 487."

For a very interesting discussion of this question, see *Ex parte Pittman,* 31 Nev., 43, 99 P., 700, 701, 22 L. R. A. (N. S.), 266, 20 Ann. Cas., 1319. In that case the Court said: "Indeed, it would be next to impossible to carry on the great business transactions of this country, which aggregate hundreds of billions of dollars annually, without the aid of a well-organized banking system. It needs no extended argument to establish the fact that the banking busi-

ness is in a class by itself. The assertion of the fact should be sufficient."

And again: "Common experience has abundantly demonstrated that the prosperity of the country is very largely influenced by public confidence in its banking institutions. Anything which tends to shake that confidence and causes depositors in banks to withdraw their deposits, produces contraction in business, which may result, and at times has resulted, in panics which have brought ruin and disaster to thousands, and seriously affected the welfare and happiness of the public generally for greater or less periods of time."

Also: "To regulate the banking business so as to reduce to a minimum failures in this branch of business enterprise is not only clearly within the powers of the legislative department of government, but it may also be said to be an imperative duty for the Legislature to enact laws for the prevention, as far as possible, of bank failures."

The question, therefore, is, Was the Legislature justified, in view of the serious banking conditions prevailing throughout the State and generally, in the exercise of the police power of the State, in passing the Banking Act of 1933? It is contended that the portion of the Act contained in Section 4 which forbids the bringing of an action for any purpose against the banks by any one—which includes the depositors and stockholders—is unconstitutional, for the reasons that it deprives the respondent and other depositors of the bank of their property without due process of law, prevents their collection of the stockholders' liability guaranteed to them by the Constitution, and denies to them the right of a speedy remedy in the Courts for wrong sustained. To this question we have given serious thought.

It is evident that only under extraordinary and serious conditions, affecting the common good and general welfare, would the Legislature be justified in even temporarily suspending—as was done in this case—

such rights; and, of course, this could be done, if at all, only under the police power, which is an attribute of sovereignty and necessary to the existence of government itself. The exercise of this power rests upon the maxim that one cannot use his own property so as to injure the rights of others, and on that other well-known maxim that the safety of the people is the supreme law. If the time comes in the life of any people when the common good and the general welfare demand it, the exercise and assumption of such power, through legislative action, is entirely justified. A police regulation, therefore, intended as such, and not operating unreasonably beyond the occasion of its enactment, is not rendered void or invalid by the fact that it may incidentally affect some right guaranteed by the Constitution; it may not, however, unreasonably invade private rights or arbitrarily violate constitutional guaranties.

In order to sustain any legislation under the police power, the Courts must be able to see that its operation tends to preserve and insure the common good and general welfare; and only in cases where the Legislature exceeds its powers will the Courts interfere and set up their judgment against that of the lawmaking body. In short, the general rule is that the Legislature is primarily the judge as to what laws should be enacted for the protection and welfare of the State and its people; but, in the last analysis, the question of the validity of such measures so enacted is one for the Court.

We need not dwell here upon the serious conditions which prevailed in banking circles prior to and at the time of the passage of the 1933 Act, and which still prevail, to a greater or less degree. These conditions are matters of common knowledge, and existed, not only in this State, but throughout the nation. Even the solvent banks, because of general conditions, were unable to properly function. Many banking institutions were loaded with assets that could not be liquidated. Gold in large quantities

was withdrawn for purposes of hoarding; lack of public confidence in the soundness of the banks caused the abnormal withdrawal of deposits; and a nightmare of uncertainty and panic threatened with disaster the business life of the country. It was only firm and timely action of the President of the United States and the Governors of the several states which prevented the entire and immediate collapse of our financial system and the wrecking of our banking institutions everywhere. The causes that brought about these conditions are not here matters for consideration. We are concerned only with the undisputed existence of a serious emergency, imperatively requiring that something be done for the protection and safety of the public and for the common good; and the situation was of such nature as to require heroic action. It is evident that the Legislature, in its enactment of the 1933 law, intended to meet this emergency, and thereby to provide a remedy and a method of administering banking affairs for the purpose of protecting, as far as possible, the property and rights of the public generally. Some of the banks were sound, but closed temporarily because of existing conditions; others, while not perhaps absolutely sound, were in such condition that they might by reorganization be made to function normally; while still others might be insolvent—and these being, in the circumstances, a menace to the whole system, required such special consideration and treatment as their peculiar conditions might indicate, in order to obviate or lessen the general danger which they created. In such emergency we think the Legislature could and did properly exercise the police power of the State in the passage of the Act.

It is also a matter of common knowledge that a great many banks are still unopened or functioning under restrictions. Which of these may be reorganized and which are hopelessly insolvent are matters not yet finally determined. The Court fully appreciates the feelings of the many depositors in these institutions. In their honest desire, how-

ever, to obtain what they conceive to be rightly theirs, the depositors and others affected must not be allowed to so use their own property as to bring an irreparable calamity upon the general public. The appointment of receivers for any of these banks would have the effect of taking out of the hands of the Governor the administration of the affairs of such banks and placing them in the control of the Courts for liquidation. And, if the appointment of receivers is sanctioned, doubtless many suits will be instituted for that purpose, which would result in chaos and confusion in the reorganization and rehabilitation of the banking system of the State, and thereby defeat the very purpose of the Act.

It is hardly necessary to repeat what we have already indicated, that the Act was intended to be only a suspension of certain legal rights enjoyed by the citizen in normal times, and such suspension can exist so long only as the necessity for it appears.

The writ of prohibition will issue as prayed for. And it is so ordered.

MESSRS. JUSTICES CARTER and BONHAM concur.

MR. CHIEF JUSTICE BLEASE (concurring in part and dissenting in part) : While being in thorough accord with the holding in this opinion to the effect that the Act in question is not violative of the Constitution of the State, I do not think prohibition properly lies, and with the conclusion announced in the opinion as to that I am not in agreement. The Court of Common Pleas had proper jurisdiction of this cause, and, when a Court, inferior to this, is acting within its jurisdiction, a writ of prohibition should not be granted by this Court; and that is the rule announced by previous decisions of this Court.