14137

CLARKE v. SOUTH CAROLINA PUBLIC SERVICE AUTHORITY *ET AL.*

(181 S. E., 481)

X

428

*Mr. Shepard K. Nash,* for plaintiff,

*Messrs. Jefferies & McLeod, Robert McC. Figg, Jr., W. L. Daniel* and *James H. Fowles,* for defendants,

432

September 10, 1935.

The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

The plaintiff, a citizen and taxpayer of the County of Sumter and of the State of South Carolina, instituted this proceeding in the original jurisdiction of this Court for the purpose of having declared unconstitutional Act No. 887 (38 Statutes at Large, p. 1507) passed by the Legislature at its 1934 session, which is hereinafter referred to as the Act.

The matter now comes before this Court upon the order of the Chief Justice dated August 7, 1935, based upon the verified amended complaint, requiring the defendants to show cause, if any they can, why the Act should not be declared unconstitutional and why the defendants should not be enjoined from exercising the powers granted to them under said Act. The defendants have answered and made a return to the rule to show cause in which they put at issue all allegations of unconstitutionality.

The General Assembly, by the Act, created a body politic and corporate called South Carolina Public Service Authority (hereinafter called the Authority), and therein authorized and empowered it, among other things, to build and construct a hydro-electric and navigation project by diverting the waters of the Santee River into the Cooper River. Said Act also authorized the Authority to provide for health betterment, flood control, and reforestation, and improvement of navigation in the territory contemplated in the project. The Authority was likewise authorized, without in any way

pledging the faith, credit, and taxing power of the State, to finance the construction of said project by borrowing money to be evidenced by bonds secured by a foreclosable mortgage on the project. The directors of the Authority have been appointed and propose to enter into a loan and grant agreement with the United States of America, acting by and through the Federal Emergency Administration of Public Works (hereinafter called the Government), in substantially the form of the loan and grant agreement incorporated in this case as "Exhibit A" of the amended complaint, for the construction of said project, under the terms of which loan and grant agreement the Government is to make to the Authority a grant of not exceeding $16,875,000-.00 which will not have to be repaid by the Authority and will lend to the Authority not exceeding $20,625,000.00, to be evidenced by bonds of the Authority secured by a mortgage on the property to be acquired with the proceeds of the grant and loan. The plaintiff in this cause seeks to enjoin the Authority from proceeding with the execution of the loan and grant agreement, the issuance of the bonds, the execution of the mortgage, and the construction of the project.

It appears from the record that this project is one which has been contemplated in various forms for more than one hundred years by citizens of South Carolina. As early as 1786 a company was incorporated, including among its directors many of the most famous personages of that time, to construct the Santee Canal between the Santee and Cooper rivers for the purpose of aiding in navigation from the upper and central parts of the State to the Atlantic Ocean at Charleston. This development was aided, among others, by General George Washington before he became President and Marquis de Lafayette. See A. S. Salley's appendix to Porcher's History of the Santee Canal. It also appears that this canal was actually completed and for a half century constituted one of the main arteries of commerce in South Caro-

lina. The Act gives the Authority the power to restore navigation through the Santee Canal and up to Columbia and Camden as well as to construct a gigantic hydro-electric development and to provide for the betterment of the public health and flood control and reforestation. The Act gives to the Authority the power to sell its electric energy in other states as well as in South Carolina.

Acts Nos. 821 and 823 of the Acts of 1928 (35 Stats. at Large, pp. 1765 and 1770) amended the Charter of the Columbia Railway & Navigation Company (the original charter having been dated November 1, 1913, and having been amended on April 8, 1921). Said Acts give to the Columbia Railway & Navigation Company, a private corporation, the right to build the project which the Authority is now empowered to build. The private corporation also owns a license from the Federal Power Commission originally issued in 1926 permitting the construction of the project, which license the Authority proposes to acquire.

The Court in this case is called upon to pass upon the constitutionality of the Act. In determining this question it is to be observed that it is a well-settled rule in South Carolina that: A statute will, if possible, be construed so as to render it valid; that a legislative Act will not be declared unconstitutional unless its repugnance to the Constitution is clear and beyond reasonable doubt; that every presumption will be made in favor of the constitutionality of a legislative enactment; that it will be declared unconstitutional only when its invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution; that all reasonable presumptions must be made in favor of the validity of the Act; and that the Constitution of South Carolina is a limitation upon, rather than a grant of, legislative power.

See *State v. Moorer,* 152 S. C., 455, 150 S. E., 269; *Wingfield v. Tax Commission,* 147 S. C., 116, 144 S. E.,

846; *Battle v. Willcox,* 128 S. C., 500, 122 S. E., 516; *Xepapas v. Richardson,* 149 S. C., 52, 146 S. E., 686; *Scroggie v. Scarborough,* 162 S. C., 218, 160 S. E., 596; *Santee Mills v. Query,* 122 S. C., 158, 115 S. E., 202; *Duke Power Company v. Bell,* 156 S. C., 299, 152 S. E., 865; *Fripp v. Coburn,* 101 S. C., 312, 85 S. E., 774; *Cathcart v. Columbia,* 170 S. C., 362, 170 S. E., 435; *Park v. Greenwood County,* 174 S. C., 35, 176 S. E., 870.

I. It is contended that the Act violates Section 17 of Article 3 of the Constitution, in that it relates to more than one subject not expressed in the title, in violation of said section. This question has been before the Court on numerous occasions. It is concluded adversely to the position of the plaintiff by the case of *State v. Moorer,* 152 S. C., 455, 150 S. E., 269, 272, in which case the Court speaking through Mr. Chief Justice Stabler said:

"It is contended that the Act in question is violative of Section 17 of Article 3 of the state Constitution, which provides that 'Every Act or Resolution having the force of law shall relate to but one subject, and that shall be expressed in the title.'

"In *Verner v. Muller,* 89 S. C., 117, 71 S. E., 654, 655, with regard to this provision, the Court said: 'The mandate of the Constitution is complied with if the title states the general subject of legislation and the provisions in the body of the Act are germane thereto as means to accomplish the object expressed in the title. *Connor v. Railroad,* 23 S. C., 427; *State v. O'Day,* 74 S. C., 448, 54 S. E., 607.' * * *

" 'It is not necessary that the title should be an index of the contents of the statute.' *Briggs v. Greenville County,* 137 S. C., 288, 135 S. E., 153, 163. See, also, *Means v. Highway Department,* 146 S. C., 19, 143 S. E., 360; *McKiever v. City of Sumter,* 137 S. C., 266, 135 S. E., 60."

This objection is clearly untenable and the same is overruled.

II. It is also contended that the Act is unconstitutional in permitting the expenditure of money from the contingent fund of the Governor to pay traveling expenses of the board of directors of the Authority.

As this Court has so many times held that the Legislature has full authority to make such appropriations as it deems wise in the absence of any specific constitutional prohibition against such appropriation, this contention of the plaintiff requires no extended discussion and the Court holds that such appropriation was constitutional and proper. See *State v. Moorer, supra; Briggs v. Greenville County,* 137 S. C., 288, 135 S. E., 153.

It is well to observe, however, that in Section 2 of the Act it is provided that the funds paid from the contingent fund shall be in the nature of an advance which will be repaid.

III. By Paragraph 5 of the amended complaint it is alleged that the bonds proposed to be issued, and the mortgage to be executed by the said Authority under said Act and loan and grant agreement, will be invalid for the reason that the South Carolina Public Service Authority is not legally constituted, in that the position of director is an office of honor and profit as defined by the Constitution of South Carolina, and at least three members of the board of directors held at the time of their appointment, and still hold, other offices of honor and profit.

It is conceded by the defendants in the return and answer that at the time of their appointment as members of the board of directors three members thereof held, and still hold, public offices in South Carolina.

For the purposes of this case we deem it unnecessary to decide whether membership on the board of directors amounts to the holding of a public office, for the reason that the only question necessary now to be decided by this Court is whether the bonds proposed to be issued and the mortgage and loan and grant agreement to be executed by the Authority will be invalid and null and void because now and at

the time of their appointment as directors three of them held public offices of honor and profit. Even if these directors are officers of the State, as contended by the plaintiff and at the time of their appointment as such held and still hold offices of honor and profit, as alleged, nevertheless the proposed Acts of the Authority would not be invalid for that reason, because, as has frequently been held by this Court, an officer has good title to the latest office to which he is appointed, and for the holding of which he has duly qualified. It is sufficient for the purposes of this case to hold that the named directors are not disqualified to perform the duties imposed upon them by the Act creating the South Carolina Public Service Authority, and the bonds to be issued, and the mortgage and loan and grant agreement, to be executed by the Authority, including said members, will be valid and binding for the reasons herein set forth.

IV. Several of the objections raised by the plaintiff are properly combined in the question: "Did the General Assembly of South Carolina have the power to create the Authority as an agency of Government to engage in the power business in competition with private industries, and to engage in interstate commerce?" The issue as here stated is discussed by the defendants in their brief under their questions as follows:

"IV. Did the General Assembly have power to create the Authority?

"V. Did the General Assembly have power to create an agency to engage in the power business?"

"VIII. Does Act 887 violate the Constitution by confiscating business of individuals or corporations?

"IX. Are the purposes of the Authority public purposes?

"X. Does the interstate character of the Authority violate any constitutional provisions?"

The General Assembly has a right to pass such legislation as in its judgment may seem beneficial to the State, and to create such agencies of government as

may be necessary to carry out its purpose, unless expressly prohibited by the Constitution. To the Legislature of South Carolina, consisting of the House and Senate, is granted the legislative power by the Constitution of 1895, Article 3, § 1, in this broad language: "The legislative power of this State shall be vested in two distinct branches, the one to be styled the 'Senate' and the other the 'House of Representatives,' and both together the 'General Assembly of the State of South Carolina.'"

Our Courts have held that by the use of this language the people of the State vested the General Assembly with the entire legislative power of the State, subject only to such restrictions upon and regulations of such power as were contained in the Constitution itself. It is the theory and intent of the Constitution of South Carolina that the powers vested in the General Assembly include all powers not specifically reserved by the Constitution. *Massey v. Glynn,* 106 S. C., 53, 90 S. E., 321; *State v. City Council of Aiken,* 42 S. C., 222, 20 S. E., 221, 26 L. R. A., 345; *Mauldin v. City Council of Greenville,* 42 S. C., 293, 20 S. E., 842, 27 L. R. A., 284, 46 Am. St. Rep., 723; *Cathcart v. City of Columbia,* 170 S. C., 362, 170 S. E., 435.

This is well declared by Mr. Justice Stabler, now Chief Justice, in the case of *Park v. Greenwood County,* 174 S. C., 35, 176 S. E., 870, 871, in the following language: "In the recent case of *Heslep v. State Highway Department,* 171 S. C., 186, 171 S. E., 913, 915, the opinion was closed with this observation, pertinent here: 'It has always been, and is now, the law that the General Assembly may enact any Act it desires to pass, if such legislation is not expressly prohibited by the Constitution of this State or the Constitution of the United States. We find nothing in either of the Constitutions which prohibited the enactment of the law attacked in this case.'"

The general statement of the rule is that the powers of the General Assembly are plenary as to all matters of legislation

unless limited by some provision of the Constitution. *Waterloo School District v. School District,* 106 S. C., 292, 91 S. E., 257; *State v. Gossett,* 117 S. C., 76, 108 S. E., 290, 16 A. L. R., 1299; *Walpole v. Wall,* 153 S. C., 106, 149 S. E., 760.

The Authority was created for many purposes, including, among others, the promotion of navigation, the betterment of public health, the establishment of a system of flood control, the reforestation of watersheds, and the construction of a hydro-electric development to furnish adequate and cheap electrical energy to all of the people of South Carolina. See Act, §§ 3, 7, and 8. These purposes are expressly declared in the Act in Section 7 to be public purposes.

Since the decision in the case of *Park v. Greenwood County, supra,* was rendered, there is no question as to the manufacture and sale of power being a public and governmental function. This being a public and governmental function, and there being no constitutional prohibition against the State through a proper governmental agency engaging in the hydro-electric power business for the benefit of the people of South Carolina, we hold that the Legislature had the right to create the Authority to engage in the hydro-electric power business.

It is well settled, and this Court holds, that navigation, health betterment, flood control, and the reforestation of watersheds are public purposes in which the State is interested and may engage. Article 1, § 28, Constitution 1895; Article 8, § 10, Constitution 1895, 45 C. J., 421, 29 C. J., 242, 36 C. J., 997, 59 C. J., 163.

It is next urged that the Act is unconstitutional in that the Authority will unlawfully compete with private industries, and unlawfully confiscate the business of private individuals and corporations. The amended complaint states this objection in two subdivisions; the first alleging that the Act is unfair, unjust, and discrimina-

tory, in violation of Section 5, Article 1 of the Constitution, because the Act will produce a confiscation of the business of individuals and corporations engaged in electrical utilities enterprises; and the second alleging that as a result of such unlawful confiscation and otherwise the State and its political subdivisions would sustain heavy losses in taxes, and that the taxes of the plaintiff would be thereby increased.

It appears from the record that the construction of the project which the Authority proposes to undertake was authorized by the South Carolina Legislature by Acts Nos. 821 and 823 of the Acts of 1928 (35 Statutes at Large, pp. 1765 and 1770), by which the Columbia Railway & Navigation Company, a private corporation, was authorized to construct the identical project. It also appears that the Columbia Railway & Navigation Company now holds a Federal power license authorizing it to construct the identical project, which power license the Authority proposes to acquire. This project could be constructed by a private corporation, and operated in competition with other private utilities.

But it is contended that the Authority is exempt from paying taxes, whereas a private corporation would have to pay taxes on its properties. This cannot change the situation, because public property is never taxed, and it appears from .the record that the Authority will pay into the State Treasury a portion of its revenues which will reasonably be expected to be equivalent to taxes paid by a private corporation in like situation. On this question, however, the case of *Duke Power Company v. Bell,* 156 S. C., 299, 152 S. E., 865, is very much in point, for in that case a private utility company was granted exemption from taxation; the Court in that case citing with approval the following from 26 R. C. L., 297: "The power to prescribe what property shall be taxed implies the power to prescribe what property shall be exempt, and, in the absence of a special constitutional provision to the contrary, the Legislature may exempt such classes of prop-

erty from taxation as in its opinion the public policy of the State requires."

Aside from the fact that the identical project might have been constructed by a private corporation, the Court is of the opinion that the Authority, as an agency of the State, has the right to build an improvement of this character regardless of what effect it might have on any private utility or citizen for the reason that the welfare of the State and its people are paramount.

"But the rights of the public, as well as the rights of one individual, are involved, and ordinarily, when these two rights conflict, the rights of the individual must yield to the rights of the public." *Farrow v. City Council of Charleston,* 169 S. C., 373, 168 S. E., 852, 856, 87 A. L. R., 981.

This Court has approved the participation in or operation by public bodies of projects involving power plants, hotels, office buildings, hospitals, waterworks systems, and stadiums. See *Park v. Greenwood County, supra; Haesloop v. City of Charleston,* 123 S. C., 272, 115 S. E., 596; *Chapman v. Greenville Chamber of Commerce,* 127 S. C., 173, 120 S. E., 584; *Battle v. Willcox, supra; Law v. Spartanburg,* 148 S. C., 229, 146 S. E., 12; *Davis v. Saluda,* 147 S. C., 498, 145 S. E., 412; *Greene v. Rock Hill,* 149 S. C., 234, 147 S. E., 346; *Roach v. City of Columbia,* 172 S. C., 478, 174 S. E., 461; *Paris Mountain Water Company v. City of Greenville,* 110 S. C., 36, 96 S. E., 545; *Cathcart v. City of Columbia, supra;* see, also, *Home Building & Loan Association v. Blaisdell,* 290 U. S., 398, 54 S. Ct., 231, 78 L. Ed., 413, 88 A. L. R., 1481.

"It must be conceded that the City of California has the right, if it proceeds according to law, to build and operate a municipal light plant, although it will compete with, and *may altogether destroy the value of, the plaintiff's plant.*" (Italics ours.) *Missouri Utilities Company v. City of California* (D. C.), 8 F. Supp., 454, 465. "It by no means follows that it cannot sell property which it owns, even though

in doing so it may enter into competition with other public or private owners of property." *Tennessee Valley Authority v. Ashwander,* 78 F. (2d), 578, Circuit Court of Appeals, Fifth Circuit, filed July 17, 1935. See, also, *Arizona v. California,* 283 U. S., 423, 51 S. Ct., 522, 75 L. Ed., 1154; and *State ex rel., Loseke v. Fricke,* 126 Neb., 736, 254 N. W., 409.

The policy of such an undertaking is for the determinination of the Legislature, and not for the Court; the Court being interested only in seeing that the end is achieved by constitutional means. *Chapman v. Greenville Chamber of Commerce, supra; Santee Mills v. Query, supra; State ex rel., Zimmerman v Gibbes,* 171 S. C., 209, 172 S. E., 130.

"The manner of the disposal of public property and the extent to which it may be allowed to affect private business are within the discretion of Congress. An exercise of legislative discretion is reviewable at the ballot box rather than in the courts." Concurring opinion of Justice Sibley in *Tennessee Valley Authority v. Ashwander* (C. C. A., 5th Circuit), 78 F. (2d), 578.

The only kind of competition that the Courts can restrain is unlawful competition. The Court can find no unlawful competition provided for in the Act or contemplated by the Authority. The Court holds that the Act is not unlawful, unjust, and discriminatory, and that it will not confiscate the business of private corporations and individuals engaged in electral utilities.

In Subdivision h of Section 8 of the amended complaint the plaintiff complains that the Act will confiscate properties of numerous electrical utilities companies who are now paying large sums of money into the treasuries of South Carolina and its various political subdivisions, and by such confiscation a large source of tax money will be stopped. The Court has just held that the Act is not unfair and confiscatory. But this question involves one more of policy than of law. In the matter of taxation the

Legislature has full power in the absence of some constititional provision. No constitutional provision on this question has been pointed out to the Court, and the Court knows of none.

"Under our form of government the Legislature is given plenary power in the matter of taxation, subject, of course, to express constitutional limitation. See Cooley's Constitutional Limitation (8th Ed.), p. 986 et seq." The above quotation was approved by this Court in *State v. Moorer*, 152 S. C., 455, 150 S. E., 269, 279. See, also, *Briggs v. Greenville County*, 137 S. C., 288, 135 S. E., 153.

The Legislature has the power to deprive the State or any of its political subdivisions of any source of revenue by proper legislation, subject to constitutional limitations, and even if the State or any of its political subdivisions might sustain a loss of taxes in any way from the construction and operation of the project authorized by the Act this cannot interfere, because no constitutional provision is violated, and the entire matter is one of policy for the Legislature, and not for the Court.

It will therefore follow that, even if the fear of plaintiff that his taxes might be increased by the State and its political subdivisions losing revenue, this would be a matter of policy for the Legislature, and not for the Courts. No constitutional provision is violated, and the objection is overruled.

We also hold that the Act is not rendered unconstitutional by reason of the fact that the Authority is authorized to sell electrical energy beyond the bounds of the State of South Carolina. See by way of analogy *Park v. Greenwood County, supra; Paris Mountain Water Company v. City of Greenville, supra; Cathcart v. City of Columbia, supra.*

V. Does the Act unlawfully delegate legislative duties and powers without the supervision of the South Carolina Public Service Commission?

While the Legislature may not delegate its powers to make laws, it may vest in administrative officers, agencies of government, commissions, and bodies a large measure of discretionary authority in matters relating to the administration and execution of statutes and it may delegate to others powers which it might rightfully exercise itself. *State v. Moorer, supra.* This Court has in many instances held that delegations of powers to perform administrative and ministerial Acts were not unconstitutional. *Battle v. Willcox,* 128 S. C., 500, 122 S. E., 516; *Greenville v. Foster,* 101 S. C., 318, 85 S. E., 769; *Dillon Catfish Drainage District v. Bank,* 143 S. C., 178, 141 S. E., 274; *Morton, Bliss & Co. v. Comptroller General,* 4 S. C., 430, 431; *State ex rel. Port Royal Mining Co. v. Hagood,* 30 S. C., 519, 9 S. E., 686, 3 L. R. A., 841; *Kirk v. Board of Health,* 83 S. C., 372, 65 S. E., 387, 23 L. R. A. (N. S.), 1188; *Henderson v. McMaster,* 104 S. C., 268, 88 S. E., 645; *Cathcart v. Columbia,* 170 S. C., 362, 170 S. E., 435; *Fowler v. Anderson,* 131 S. C., 471, 128 S. E., 410; *Powell v. Hargrove,* 136 S. C., 345, 134 S. E., 380; *Lillard v. Melton,* 103 S. C., 10, 87 S. E., 421; *Waterloo School District v. School District,* 106 S. C., 292, 91 S. E., 257; *Ruff v. Boulware,* 133 S. C., 420, 131 S. E., 29.

It is also contended by the plaintiff that the Public Service Commission is entrusted with the exclusive power to regulate utilities in South Carolina, and that the Act is unconstitutional in permitting the Authority to fix its rates. We do not think this position is tenable, for the reason that the Public Service Commission was entrusted with the supervision of utilities by statute and not by the Constitution, and the Authority was granted permission to fix its rates by a statute which was enacted subsequent to the Act allowing the Public Service Commission to fix rates for utilities. It might also be observed that in the Utilities Act (37 Stats. at Large, page 1497, and as amended by 38 Stats. at Large, at page 1452), the rates charged by municipalities were specifically

exempted from the supervision of the Public Service Commission.

It is contended that the "Lending Agency" is given the right under the Act and proposed mortgage to exercise a supervision over the rates to be charged by the Authority for the sale of electric energy. We do not construe the Act or the mortgage to give the "Lending Agency" any right to fix the rates to be charged by the Authority but these provisions are in the nature of covenants which would naturally follow from the borrowing money with which to finance a public development, which covenants we find the Authority has ample power to make and which do not violate any constitutional provision.

We hold, therefore, that the Act does not unconstitutionally delegate legislative power.

VI. The plaintiff has most earnestly presented to the Court the question: Is a debt of the State or any of its political subdivisions within constitutional inhibitions authorized by the Act or will any such debt be created by the bonds and mortgage of the Authority or by the obligation of the Authority to complete and operate the project? This question is discussed by the defendants in their brief under the following questions:

"II. Will the mortgage to be executed by the Authority constitute a debt of the State within constitutional inhibitions?

"III. Will the bonds to be issued by the Authority constitute a debt of the State within constitutional inhibitions?"

"XI. Will the obligation of the Authority to complete and operate the project constitute a debt of the State within constitutional inhibitions (Const., Art. 10, §§ 6, 7, 11)?"

The Act, and the loan and grant agreement, and the bonds and mortgage which the Authority proposes to execute, provide that the obligations shall be payable solely from the revenues of the Authority. The bonds will be secured by a foreclosable mortgage on all of the properties of the Au-

thority, including a franchise to operate the project for a period of twenty years. In the recent case of *Cathcart v. Columbia, supra,* this Court held that the bonds issued by the City of Columbia, payable solely out of the revenues derived from the operation of a stadium constructed with the proceeds of bonds issued for that purpose, did not constitute a debt of the City of Columbia within the meaning of the constitutional prohibitions against the creation of public debt. The principle of this decision was upheld and affirmed in the case of *Park v. Greenwood County, supra,* and in *Roach v. Columbia, supra.* The great weight of authority in American jurisdictions is in line with the above decisions.

This Court has also constantly held that bonds issued by the State or its political subdivisions which are payable out of special funds do not create debts of the State or its political subdivisions although the full faith, credit, and taxing powers of the State or its political subdivisions are pledged for the payment of the same. See *Briggs v. Greenville County,* 137 S. C., 288, 135 S. E., 153; *Evans v. Beattie,* 137 S. C., 496, 135 S. E., 538; *Lillard v. Melton,* 103 S. C., 10, 87 S. E., 421; *Brownlee v. Brock,* 107 S. C., 230, 92 S. E., 477; *McIntyre v. Rogers,* 123 S. C., 334, 116 S. E., 277; *Barnwell v. Matthews,* 132 S. C., 314, 128 S. E., 712; *Sullivan v. City Council of Charleston,* 133 S. C., 189, 133 S. E., 340; *State v. Moorer, supra.*

In this case the full faith, credit, and taxing powers of the State or any of its political subdivisions cannot be pledged, either directly or contingently, for the payment of the obligations. However, the bonds in this case are to be secured by a foreclosable mortgage, as above stated, and the question arises as to whether the giving of the mortgage will change the status of the bonds so as to bring them within the meaning of the constitutional provisions against the creation of a public debt. This Court is unable to see how the giving of a mortgage over property to be acquired from the proceeds of the bonds to be sold would change the status of the bonds

so as to make them debts of the State within the constitutional inhibitions against the creation of a public debt without the vote of the people, especially when no funds, or property, acquired from taxation are involved, and the mortgage is payable solely from the revenues of the Authority. A clear statement of the rule is found in 72 A. L. R., 701, from which we quote as follows: "The weight of authority, however, supports the view that such a transaction (issuance of revenue bonds), does not create a debt or liability where no mortgage or other lien is placed on the existing property of the city. Where, however, a mortgage is imposed on property already owned by the municipality or upon other property, in addition to that purchased, to secure the purchase price, there is an indebtedness or liability within the meaning of the debt limitation. *But, according to the weight of authority, this rule does not apply where the mortgage or vendor's lien applies only to the property purchased.*" (Italics ours.)

In the present case the record clearly shows that the mortgage will apply only to property to be purchased by the proceeds of the loan and grant, and that no property now belonging to the State or to be acquired by taxation will be covered by the mortgage.

This principle is clearly established in the very recent case of *State ex rel. Normile et al. v. Cooney et al.* (Mont.), 47 P. (2d), 637, 647, decided July 10, 1935 (not yet reported [in State report]), in which it was sought by a taxpayer to enjoin the operation of a state project, which, like the instant case, was to be financed by a loan and grant to be obtained from the government, and which was to be secured by a pledge of revenues from the project and by a mortgage on the project. The Court, in holding that the issuance of the bonds secured by a mortgage on the project did not create a debt within the constitutional limitations, stated:

"The bonds of each project are payable only from the revenues derived therefrom. Such a plan does not violate this

provision of the Constitution. [citing cases.] The section does not prohibit the mortgaging of property, unless thereby a debt of the State is created. * * *

"A somewhat similar provision was found in the Act under consideration in the case of *State ex rel. Hawkins v. State Board of Examiners* [97 Mont., 441, 35 P. (2d), 116], *supra,* and of it we said: 'The provision of the Act under consideration that the building may be mortgaged or deeded in trust for the benefit of the bondholders does not tend to subject the State to liability, because it does not purport to encumber any property owned by the State.' Here, when the State will own the property mortgaged, but on being reimbursed for its entire outlay on behalf of the project, it will hold only the naked legal title, the equitable title passing to the mortgagee who has furnished the funds to reimburse the State. No debt of the State is thereby created."

See, also, *State ex rel. Hawkins v. State Board of Examiners,* 97 Mont., 441, 35 P. (2d), 116.

Another very recent case on the point is that of *State ex rel. Excelsior Springs v. Smith* (Mo. Sup.), 82 S. W. (2d), 37, 41, in which a mandamus proceeding was brought to compel the State Auditor to register certain bonds, the auditor having refused to do so on the ground that they were in conflict with the constitutional provision against increasing the public debt. The City of Excelsior Springs proposed to obtain a loan and grant from the government to be evidenced by bonds secured by a mortgage on the project. The Court said: "In those cases there was no mortgage, whereas in this case the debt is secured by a mortgage on the properties. From this it is argued that property belonging to the city may be lost by foreclosure. We do not think so. In effect, the sale of bonds, purchase of property, and execution of mortgage were simultaneous. Under the Act of the Legislature, the city has not and will not contribute property or expend money in aid of the improvement. The sale of the bonds, purchase of the lands, and execution of the mortgage

lodged in the city no beneficial interest in the properties covered by the mortgage. The city only holds the legal title to the properties, conditioned on acquiring, if ever, the beneficial interest by payment of the bonds from income derived from the properties. It follows the city could lose no property by a foreclosure of the mortgage. In this connection it is argued that 'a debt is inherent in the nature of a mortgage.' Even so, it may not be a debt within the meaning of Section 12, Art. 10 of the Constitution. The sale of the bonds did not create a debt within the meaning of said section of the Constitution."

Likewise in the case of *Hughes v. State Board of Health,* 260 Ky., 228, 84 S. W. (2d), 52, 54, in which the commonwealth of Kentucky transferred a tubercular sanatorium to the board of health so that it might obtain a loan from the government to be evidenced by bonds secured by a mortgage of the property, it was held that no debt within the constitutional inhibitions was created. The Court said: "We can see no substantial grounds upon which it can be argued successfully that the transfer of the property to the board, and the pledging thereof by the board to secure the government loan, creates a debt against the commonwealth in contravention of Sections 49 or 50 of the Constitution. Likewise Section 177 is of no applicable effect, since there is no lending or pledging of credit to any individual or to any one of the bodies named in that section."

To the same effect, see *Kasch v. Miller,* 104 Ohio St., 281, 135 N. E., 813; *Fox v. Bicknell* (1923), 193 Ind., 537, 141 N. E., 222; *Brockenbrough v. Board of Water Com'rs* (1903), 134 N. C., 1, 46 S. E., 28; *Lang v. Cavalier* (1930), 59 N. D., 75, 228 N. W., 819; *Connor v. Marshfield* (1906), 128 Wis., 280, 107 N. W., 639; *Iowa Southern Utilities Co. v. Cassill* (C. C. A., 8th, 1934), 69 F. (2d), 703; *Bankhead v. Sulligent,* 229 Ala., 45, 155 So., 869, 96 A. L. R., 1381; *Oppenheimer v. Florence,* 229 Ala., 50, 155 So., 859; *Smith v. Guin,* 229 Ala., 61, 155 So., 865;

*City of Jerseyville v. Connett* (C. C. A., 7th Circuit) 49 F. (2d), 246.

While the cases from other jurisdictions are extremely interesting and show that the great weight of authority holds that mortgages given to secure bonds issued to provide funds to acquire the property mortgaged do not constitute public debts within constitutional inhibitions yet there are adequate decisions of this Court to sustain the mortgage in this case without resorting to any cases from other jurisdictions. Almost the exact point was before the Court in the case of *Cathcart v. City of Columbia,* 170 S. C., 362, 170 S. E., 435, 438, in which this Court sustained a statutory lien, in the following language: "The lien created by the Act or the authorizing ordinance in a case such as the one before us would apply only to the project constructed by moneys derived from the sale of the bonds *and would partake of the nature of a purchase-money mortgage.* See *Bates v. State Bridge Commission* [109 W. Va., 186, 153 S. E., 305], *supra.* The plaintiff has cited no provision of the Constitution, and we know of none, which either forbids the Legislature to create such a lien or denies to a municipal corporation or a county the right to do so in its exercise of the powers granted it by legislative authority." (Italics ours.)

It is also contended by the plaintiff that giving a mortgage over the project will constitute an indebtedness of the State within the limitation of the Constitution for the reason that a foreclosure of the mortgage would be tantamount to a donation of public property in violation of our Constitution. This contention has been conclusively decided by this Court adversely to the contention of the plaintiff. See *Haesloop v. City of Charleston, supra; Chapman v. Greenville Chamber of Commerce, supra; Antonakas v. Anderson Chamber of Commerce,* 130 S. C., 215, 126 S. E., 35; *State of South Carolina v. Broad River Power Company et al.* (S. C.), 181 S. E., 41, decided July 22, 1935.

We therefore hold that the execution of a mortgage (to secure the bonds to be issued), in substantially the form of the proposed mortgage attached to the amended complaint, will not constitute a debt of the State or any of its political subdivisions within the constitutional provisions against creating public debt without a vote of the people.

On the question of debt, there remains the contention that the obligation of the Authority to complete and operate the project will constitute a debt within the constitutional inhibitions. The Court is impressed from the showing made by the defendants that the amount available for the construction of the project will be reasonably adequate to complete the project. The Court is further impressed from the answer and return of the defendants that the revenues anticipated to be derived from the operation of the project will be reasonably sufficient to liquidate the obligations. However, inasmuch as the Act itself and the bonds and mortgage to be issued by their terms expressly provide that no debt of the State shall be created nor shall the full faith, credit, and taxing power of the State be pledged to their payment, no debt of the State within the constitutional sense will be created, irrespective of whether or not the amount available is sufficient to construct the project, and whether or not the revenues to be derived therefrom will be sufficient to retire the obligations.

When the entire Act is carefully considered, there remains no doubt that the Legislature intended to protect the credit of the State. Time after time in the Act there is repeated in the strongest possible language the assertion that the obligations of the Authority shall never be obligations of the State or any of its political subdivisions. Under the terms of the Act no securities can be issued in the name of the State or any of its political subdivisions, but will be issued in the name of South Carolina Public Service Authority. We quote the following from Section 3 of the Act: "That the Public Service Authority shall have no power at any time

or in any manner to pledge the credit and/or the taxing power of the State or any of its political subdivisions, nor, shall any of its obligations or securities be deemed to be obligations of the State or of any of its political subdivisions; nor shall the State be legally, equitably or morally liable for the payment of principal of and/or interest on such obligations or securities. * * * The State of South Carolina and/or any political subdivision shall in no way be responsible for any debts or obligations contracted by or for the Authority, and the board of directors of the Authority, the Advisory Board, and/or the officers shall make no debt whatsoever for the payment of which the State and/or any political subdivision shall in any way be bound. It is intended that the project to be developed hereunder and any and all projects undertaken by the provisions of this Act, shall be financed as self-liquidating projects and that the credit and taxing powers of the State, and/or its political subdivisions shall never be pledged to pay said debts and obligations."

All of the provisions of the Act looking to the protection of the credit of the State are in substance specifically repeated in the loan and grant agreement, the bonds, and the mortgage, proposed to be executed by the Authority. The good faith, credit, and taxing powers of the State are fully protected under the Act itself and by all of the securities proposed to be issued, and no purchaser of such securities can be misled under the Act and the bonds and mortgage into believing that the faith, credit, and taxing powers of the State, or any of its political subdivisions are pledged to their payment, or are in any wise involved.

VII. From the above discussion it will be seen that the Act as herein construed is constitutional, and there remains for consideration the sole question of whether or not the bonds and mortgage proposed to be issued by the Authority will constitute valid and legal obligations of the Authority. We have held above that under no circumstances can a debt of the State or any of its political subdivisions be created

by the securities of the Authority, but the Authority, as a separate body corporate and politic, is given the right under the Act to issue its obligations in order to carry out its purposes as an agency of State government.

We have carefully considered the form of the bonds and the mortgage proposed to be issued by the Authority, and we hold that such bonds and mortgage in substantially the form presented to the Court in the amended complaint will comply with all of the provisions of the Act. The resolutions of the board of directors, appearing as an exhibit to the amended complaint, and dated August 7, 1935, authorizing the issuance of the bonds and mortgage, comply with the provisions of the Act, and the bonds and mortgage when issued in form substantially as presented to the Court will constitute legal and valid obligations of the Authority.

The issues in this case have been presented to this Court in a strong and forceful manner by the plaintiff in his brief and in oral argument. The Court has given careful consideration to all of the allegations of the amended complaint, but it is unable to agree with the position taken by the plaintiff.

The judgment of the Court, therefore, is that the Act in question as herein construed be and hereby is declared constitutional and valid, and that the injunction prayed for be refused, and the complaint as amended be dismissed.

MR. CHIEF JUSTICE STABLER· and MESSRS. JUSTICES CARTER, BONHAM and BAKER concur.